593 A.2d 1069

**Michael FINCI**

v.

**AMERICAN CASUALTY COMPANY OF
READING, PENNSYLVANIA et al.**

**AMERICAN CASUALTY COMPANY OF
READING, PENNSYLVANIA**

v.

**STATE OF MARYLAND DEPOSIT INSURANCE
FUND CORP. et al.**

No. 81, Sept. Term, 1990.

Court of Appeals of Maryland.

Aug. 16, 1991.

Richard A. Finci (Pickett, Houlon & Berman, Hyattsville), Thomas S. Schaufelberger (Michael L. Gassmann, M. Joseph Sterner, Drinker Biddle & Reath of Washington, D.C., H. Emslie Parks, Parks, Hansen & Ditch of Towson), on brief, for petitioners.

Neil J. Dilloff (Jonathan D. Smith, Kathleen A. Ellis, Timothy U. Sharpe, Piper & Marbury, J. Joseph Curran, Jr., Atty. Gen., Dennis M. Sweeney, Deputy Atty. Gen., Baltimore, on brief, for respondents.

M. Albert Figinski, James J. Hanks, Jr., Mark M. Tomaino, Weinberg & Green, Baltimore, amicus curiae, for Maryland Chamber of Commerce, Inc.

Joel M. Savits, Jordan, Coyne, Savits & Lopata of Rockville, D'Amato & Lynch, New York City, amicus curiae, for National Union Fire Ins. Co. of Pittsburgh, Pa.

Michael L. Cohen, Gerardo Puig, Wilson, Elser, Moskowitz, Edelman & Dicker of Baltimore, Thomas W. Wilson, Harold J. Moskowitz, Wayne E. Borgeest, Scott R. Schaf-

fer, Wilson, Elser, Moskowitz, Edelman & Dicker of New York City, amicus curiae, for American Ins. Assn.

Eugene J. Comey, Carrie L. Hempel, Robert F. Schiff, Sean M. Fitzpatrick, Tuttle & Taylor, Washington, D.C., amicus curiae, for Federal Deposit Ins. Corp.

Argued before ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, JJ., and CHARLES E. ORTH, Jr. and MARVIN H. SMITH, Associate Judges of the Court of Appeals (retired), and A. OWEN HENNEGAN, Judge of the Third Judicial Circuit of Maryland (retired), Specially Assigned.

RODOWSKY, Judge.

First Maryland Savings and Loan, Inc. (FMSL), a Maryland chartered, capital stock, savings and loan association, is insolvent, and State of Maryland Deposit Insurance Fund Corporation (MDIF) is its receiver. This action involves the construction of a directors' and officers' (D & O) liability insurance policy issued to FMSL by American Casualty Company of Reading, Pennsylvania (ACCO). In an underlying action MDIF obtained substantial judgments against former directors and officers of FMSL. Three of the judgment debtors, as part of settlements with MDIF, assigned their claims under the D & O policy to MDIF, which sued ACCO. A fourth director, who settled with MDIF, but who retained his claim against ACCO, also sued ACCO on the policy. The effect of the judgments entered in the trial court was to award to MDIF all of the D & O policy proceeds. The principal issues before us are whether ACCO's policy covers the claims against the directors, and, if so, whether MDIF is entitled to all of the proceeds.

The Court of Special Appeals held that two D & O policy exclusions, on which ACCO relied, were void because they

"would circumvent what we perceive to be the intent of the legislature, and thus the public policy of the State: to empower MDIF to recover, from the assets of failed savings and loan associations, every dollar available in

order to protect not only the depositors and creditors of those associations but, ultimately, to protect the taxpayers of this State."

*Finci v. American Casualty Co.*, 82 Md.App. 471, 485, 572 A.2d 1092, 1099 (1990). The Court of Special Appeals also affirmed the trial court's holding that MDIF had priority to all of the D & O policy proceeds, thus rendering moot whether the fourth director had any enforceable claim against ACCO on the insurance policy. For the reasons set forth below, we shall reverse and remand.

MDIF was appointed conservator for FMSL on November 20, 1985, by the Circuit Court for Montgomery County. The conservator filed the underlying suit against Julian Seidel and others on March 14, 1986 (the *Seidel* action). The conservatorship was converted into a receivership in June of 1986, and MDIF's original complaint evolved to a third amended complaint. With one exception, all of the claims asserted by MDIF against former directors and officers of FMSL, as such, were asserted as receiver, because the claims were based on duties of care and loyalty owed to FMSL.[1] In January 1988 judgments in the *Seidel* action were entered in favor of MDIF, including judgments, each in excess of $64 million, against Robert J. Corletta (Corletta), Frank J. Calcara (Calcara), and Benjamin Maisel (Maisel). These three judgment debtors had been directors of FMSL.

For policy periods of October 1, 1984, to October 1, 1985, and of October 1, 1985, to October 1, 1986, ACCO issued D & O liability policies to FMSL under each of which the

---

1. Count III of the third amended complaint sued four of the defendants, none of whom are involved in the instant action. The theory of Count III was fraud, consisting of the intentional submission of false delinquent loan reports by the defendants in Count III to Maryland Savings–Share Insurance Corporation (MSSIC) and to the Division of Savings and Loan Associations. MSSIC was the extinguished corporation in a merger with MDIF. Count III alleged that the false representations "were made to induce MSSIC, the Division and the general public, including FMSL depositors, to believe that FMSL's financial condition was better than it actually was."

aggregate limit of liability for the respective policy year was $3 million. The policy ending October 1, 1985, had eight endorsements, while the policy ending October 1, 1986, had twenty endorsements.

MDIF, as receiver of FMSL, sued ACCO in April 1988. The complaint alleged that ACCO had issued a D & O liability policy "to FMSL for the policy period from October 1, 1984 to October 1, 1985 ('the policy')" and that ACCO had "renewed the policy for the period from October 1, 1985 to October 1, 1986." The complaint further alleged entry of the judgments against various of the defendants in the *Seidel* action, that "[t]he policy is a contract," and that ACCO had breached the contract. Thereafter, as part of settlements with MDIF of the underlying *Seidel* action, the judgment debtors, Corletta, Calcara, and Maisel, assigned their claims against ACCO under the D & O policies to MDIF. MDIF held two of those assignments before judgment was entered in its favor against ACCO in the instant action.

Another defendant in *Seidel* was Michael Finci (Finci), who also had been a director of FMSL. During the course of the *Seidel* action Finci settled with MDIF. In April 1988 Finci also sued ACCO to recover the sums he had paid to MDIF in that settlement, as well as to recover the sums paid to Finci's attorneys as fees for defending both *Seidel* and a suit brought by a depositors' committee.[2]

ACCO raised a number of defenses in the MDIF case, all of which were rejected by the trial court. These included certain policy exclusions in addition to the two exclusions to which we shall give principal attention in this opinion. The circuit court granted summary judgment on liability in favor of MDIF against ACCO for all of the reasons presented by MDIF in written memoranda and orally.

---

2. Part of that action is reported as *Brandenburg v. Seidel,* 859 F.2d 1179 (4th Cir.1988).

MDIF also sought a ruling in *MDIF v. ACCO* that all of the proceeds under the D & O policy were payable to it to the exclusion of Finci, and of any other potential claimants. The trial court then consolidated the Finci and MDIF cases against ACCO. After giving notice and an opportunity to be heard to all potential claimants of the D & O policy proceeds, objections to MDIF's request were received only from Finci, and from one other claimant who has not appealed.[3] The circuit court then held that MDIF enjoyed priority. A judgment in *MDIF v. ACCO* was entered for $2,995,000 in favor of MDIF, representing all of the D & O policy proceeds of $3 million less a $5,000 deductible. In *Finci v. ACCO*, the court ruled that Finci's contract claims against ACCO were moot and entered judgment for ACCO on the merits, but against ACCO for costs.

ACCO and Finci appealed to the Court of Special Appeals, which affirmed. It held void the two exclusions from coverage on which ACCO principally had relied in its brief, and the court also held that MDIF was entitled to all of the policy proceeds. ACCO and Finci separately petitioned this Court for certiorari, which we granted.

The D & O policies for the years ending October 1, 1985, and October 1, 1986, were claims made policies. Although the circuit court made no finding as to when MDIF made claims against the defendants in *Seidel*, MDIF alleged in its complaint against ACCO that, on December 19, 1985, it had put ACCO on notice of its claims against directors and officers.

There are two insuring agreements in each policy. ACCO agreed

"[w]ith the Directors and Officers of the Association that if, during the policy period, any claim or claims are made against the Directors and Officers ... for a Wrongful Act, the Insurer will pay, in accordance with the terms of

---

**3.** Consequently, there is no merit to Finci's contention that a justiciable issue is lacking for want of a case or controversy between Finci and MDIF.

[the] policy ... all Loss which the Directors and Officers ... shall become legally obligated to pay."

ACCO also agreed to pay to FMSL "all Loss" for which FMSL was required to indemnify, or, to the extent lawful, had indemnified, directors and officers.[4]

"Loss" and "Wrongful Act" are defined terms in the policy. "Loss" has two aspects. One ties into the insuring agreement with FMSL and deals with its indemnification of directors and officers. The second aspect concerns the insuring agreement with directors and officers. Under the latter

"[t]he term 'Loss' shall mean any amount which the Directors and Officers are legally obligated to pay ... for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include ... damages, judgments, settlements, costs ... and defense of legal actions, claims or proceedings and appeals therefrom...."

The policy also defines

"[t]he term 'Wrongful Act' [to] mean any actual or alleged ... act or omission, or neglect or breach of duty by the Directors or Officers in the discharge of their duties solely in their capacity as Directors or Officers of the Association...."

The difference between the policy forms for the two years lies in the endorsements. One of the two exclusions struck down by the Court of Special Appeals, the "regulatory exclusion," is found only in the D & O policy for the period ending October 1, 1986. The other exclusion struck down by the Court of Special Appeals, the "insured vs. insured" exclusion, is found in the policies for both periods.

---

**4.** The agreement insuring FMSL reads that ACCO agreed

"[w]ith the Association that if, during the policy period, any claim or claims are made against the Directors and Officers ... for a Wrongful Act, the Insurer will pay, in accordance with the terms of this policy, on behalf of the Association, all Loss for which the Association is required to indemnify or for which the Association has, to the extent permitted by law, indemnified the Directors and Officers."

In addition, contract interpretation arguments are presented that neither of these exclusions applies to MDIF's claims against the former FMSL directors and officers in *Seidel.*

We shall consider the applicability and validity of the regulatory exclusion in Part I, *infra,* and of the insured vs. insured exclusion in Part II. Because the conclusions reached in those parts are not completely dispositive, we consider MDIF's priority argument in Part III and, in Part IV, arguments by ACCO concerning additional defenses stricken by the circuit court.

## I

In this Part I, the "policy" is ACCO's D & O policy for the period October 1, 1985, to October 1, 1986. It contains the regulatory exclusion which reads as follows:

"It is understood and agreed that the Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors o[r] Officers based upon or attributable to:

any action or proceeding brought by or on behalf of the Federal Deposit Insurance Corporation, the Federal Savings & Loan Insurance Corporation, any other depository insurance organization, the Comptroller of the Currency, the Federal Home Loan Bank Board, or any other national or state regulatory agency (all of said organizations and agencies hereinafter referred to as 'Agencies'), including any type of legal action which such Agencies have the legal right to bring as receiver, conservator, liquidator or otherwise, whether such action or proceeding is brought in the name of such Agencies or by or on behalf of such Agencies in the name of any other entity or solely in the name of any Third Party."

## A

Here we consider whether the regulatory exclusion is ambiguous. Ambiguity is said to result from the words,

"based upon or attributable to" any action by a regulatory agency. The argument is that the exclusion relates only to secondary actions, brought by one other than a regulatory agency, which are precipitated by the regulatory proceeding or action. Under that interpretation loss due to the claim made by the regulatory agency is covered.

The claimed ambiguity first achieved judicial recognition in *American Casualty Co. v. Federal Deposit Ins. Corp.*, 677 F.Supp. 600 (N.D.Iowa 1987) (Iowa No. 1). Iowa No. 1 relied on the ambiguity to deny summary judgment for ACCO in a declaratory judgment case. Later in that litigation ACCO renewed its motion for summary judgment, but the court continued to rule that the interpretation of the regulatory exclusion was a question of material fact. *American Casualty Co. v. Federal Deposit Ins. Corp.*, 713 F.Supp. 311, 315 (N.D.Iowa 1988) (Iowa No. 2). After trial in that same litigation the court concluded that the regulatory exclusion "clearly excludes claims by FDIC and is not ambiguous." *American Casualty Co. v. Federal Deposit Ins. Corp.*, Civil No. 86–4018, 1990 WL 66505, 1990 U.S.Dist. LEXIS 6065 (N.D.Iowa Feb. 26, 1990) (Iowa No. 3).[5] *Federal Sav. & Loan Ins. Corp. v. Mmahat*, Civil No. 86–5160, 1988 WL 19304, 1988 U.S.Dist. LEXIS 1825 (E.D.La. Mar. 3, 1988), followed the reasoning of Iowa No. 1 in denying summary judgment to ACCO. Summary judgment was granted to the insured based on the "secondary suit" ambiguity in *Federal Sav. & Loan Ins. Corp. v. Heidrick*, Civil No. HM 86–77 (D.Md. Jan. 25, 1991). Although applying Maryland law, the opinion in the latter case does not present an analysis of the policy as a whole.

■ In construing insurance contracts in Maryland we give the words of the contract their ordinary and accepted meaning, looking to the intention of the parties from the

---

5. In Iowa No. 3 the court held that there was coverage, based upon unconscionability, violation of reasonable expectations of insurance coverage, and an implied warranty of fitness. None of those theories are advanced in the instant matter.

instrument as a whole. *Pacific Indem. Co. v. Interstate Fire & Casualty Co.*, 302 Md. 383, 388, 488 A.2d 486, 488 (1985). Under the facts here the "Loss" includes the amount of judgment entered against the assigning directors in *Seidel*. That loss was "in connection with [a] claim made," the MDIF complaint, which charged "Wrongful Acts," by way of neglect of duty as directors. The claim was made in an action by a "state regulatory agency," MDIF. It was a "type of legal action which such Agenc[y] ha[d] the legal right to bring as receiver, conservator, liquidator or otherwise[.]" There is no ambiguity.

In addition to Iowa No. 3, the regulatory exclusion has been held to be unambiguous in *American Casualty Co. v. Baker*, 758 F.Supp. 1340 (C.D.Cal.1991) (reading the regulatory exclusion to apply to the Resolution Trust Corporation is natural and reasonable), *Gary v. American Casualty Co.*, 753 F.Supp. 1547 (W.D.Okla.1990) (FDIC construction of the regulatory exclusion found to be strained and unreasonable), and *Continental Casualty Co. v. Allen*, 710 F.Supp. 1088 (N.D.Tex.1989).

The policy insures against "Loss." It is not a reasonable interpretation that the words, "based upon or attributable to," carve out of the exclusion "Loss in connection with any claim made" by a regulatory agency, so as to leave the exclusion operative only as to claims secondary to the agency claim. Under the insuring agreement with directors and officers "Loss" is a legal liability to pay money to the injured party, to defense counsel, or to a court clerk for costs. Under the insuring agreement with the association, however, "Loss" is not directly concerned with the liability of the association to injured parties. Under the insuring agreement with the association, coverage is afforded for "Loss" by way of indemnifying directors and officers for claims made against them. The latter type of "Loss" will always be "attributable" to a claim made against a director or officer. Inclusion of the "based upon or attributable to" language in an exclusion means that direct "Loss" to a director or officer and indemnifying "Loss" to the associa-

tion, attributable to the director's or officer's loss, are both excluded.

Consideration of the policy as a whole confirms that the use of the "based upon or attributable to" language is not intended to limit the exclusion to secondary claims while retaining coverage for an initial claim made by an agency. The usage is simply a drafting style. Under the policy the insurer is not liable to make any payment for "Loss" based upon or attributable to

—Charges of environmental pollution (Endorsement No. 1);

—Wrongful Acts as administrator or trustee of an individual retirement account (Endorsement No. 6);

—Wrongful Acts which would have been covered by insurance agency errors and omissions insurance (Endorsement No. 8);

—Claims arising out of repurchase or reverse repurchase agreements, financial futures trading and/or hedging or commitments to purchase or sell securities or loans in the future (Endorsement No. 15); [6]

—Suits by any stockholder, including a derivative action, and any claim made by any other director or officer or by the institution (Endorsement No. 16);

—Any suit brought by any uninsured depositors (Endorsement No. 18); and

—Claim by a merger partner or acquiring entity (Endorsement No. 19).

Clearly the policy is not to be read to mean that the initial claim of all of these types is covered and only a secondary claim of these types is excluded. Loss based upon or attributable to the *Seidel* action is excluded from coverage

---

**6.** As to repurchase and reverse repurchase transactions see the excellent description by Judge Eldridge for the Court in *Comptroller of the Treasury v. First United Bank & Trust,* 320 Md. 352, 367–72, 578 A.2d 192, 199–201 (1990).

by the terms of the regulatory endorsement. We therefore turn to the issue of that endorsement's validity.

### B

■ MDIF's public policy argument is that "[a]pplication of [the regulatory exclusion] to MDIF would impair significantly MDIF's ability to perform its statutory responsibilities," and that "[a]ccordingly, it should not be enforced." Brief of Respondent MDIF at 28. The argument is inspired and supported by some decisions of federal courts involving insolvent financial institutions. The concept's genesis was *Federal Sav. & Loan Ins. Corp. v. Oldenburg,* 671 F.Supp. 720 (D.Utah 1987). *Oldenburg* was followed on this issue in *Federal Sav. & Loan Ins. Corp. v. Mmahat, supra,* and in *Branning v. CNA Ins. Cos.,* 721 F.Supp. 1180 (W.D.Wash.1989). *Oldenburg* was also cited favorably in *Federal Sav. & Loan Ins. Corp. v. Aetna Casualty & Sur. Co.,* 701 F.Supp. 1357, 1363 (E.D.Tenn.1988), where the court voided, as contrary to public policy, a provision in a blanket fidelity bond which terminated the period for discovering loss when operation of the insured institution was assumed by the Federal Savings and Loan Insurance Corporation (FSLIC).

*Oldenburg* saw the question to be "whether public policy will allow [the insolvent association] to bargain away the rights of the FSLIC to carry out its statutory function." *Oldenburg,* 671 F.Supp. at 723. The *Oldenburg* court gave two reasons for invalidating the regulatory exclusion. First, it analogized to a decision involving the household exclusion in an automobile liability policy. Secondly, the court said that enforcing the exclusion would "seriously hamper the FSLIC in carrying out its duties." *Id.* at 724.

The household exclusion decision relied on in *Oldenburg* was *Farmers Ins. Exch. v. Call,* 712 P.2d 231 (Utah 1985). That decision was cited by this Court in *State Farm Mut. Auto. Ins. Co. v. Nationwide Mut. Ins. Co.,* 307 Md. 631,

642 n. 7, 516 A.2d 586, 591 n. 7 (1986). The latter two cases involved the rule, established in Maryland in *Jennings v. Government Employees Ins. Co.*, 302 Md. 352, 488 A.2d 166 (1985), that the household exclusion is invalid because it conflicts with the public policy expressed in the compulsory automobile liability insurance statute. The *Oldenburg* court struck down a regulatory exclusion despite the absence of any statute or regulation requiring savings and loan associations insured by FSLIC to carry D & O coverage, or to keep such coverage available for a conservator or receiver as a source of recovery for claims made by the association after insolvency.

The second reason in *Oldenburg* was based on the duties of conservators and receivers. The court emphasized 12 U.S.C. § 1729(d) (1935) under which FSLIC, in the liquidation of an insured institution, has the power " 'to carry on the business of and to *collect all obligations to the insured institutions....*' " 671 F.Supp. at 723. Of course, where the contract of insurance excludes from coverage the particular claim made, there is no obligation of the insurer to the insured institution, and there is nothing for the receiver to collect under the policy.

On the other hand there are decisions that have upheld the regulatory exclusion against public policy challenges by regulatory agencies. *Continental Casualty Co. v. Allen*, 710 F.Supp. 1088, pointed out that *Oldenburg*'s reliance on statutorily required minimum automobile insurance was inapplicable to optional D & O coverage for financial institutions.

An analysis of the public policy underpinnings of *Oldenburg* is found in *Gary v. American Casualty Co.*, 753 F.Supp. 1547. Requiring, as a matter of judicially recognized public policy, that the regulatory agency has the same rights under a D & O policy as the association was said to miss the mark because in that case, as here, an insured vs. insured exclusion denied coverage to directors and officers

who were sued by their own institution.[7] We believe that this reason simply shifts the ground of the battle over interpretation and public policy to a different exclusion. Secondly, the *Gary* court said that the amount paid to insured depositors is not affected by the collectability of the recovery against defendant directors and officers. With respect to MDIF, the same is true. As the opinion of the Court of Special Appeals in this case bluntly makes plain, the public policy that was applied in the instant matter has to do with taxpayers.

The third reason given in *Gary* is that, if the regulatory exclusion seriously hampers the regulatory agency from carrying out its duties,

> "then a bank's failure to obtain directors' and officers' liability insurance would also violate public policy to the same extent because in that instance the FDIC would also have to look solely to the assets of the directors and officers to collect any judgment against them for breach of their statutory and common law duties. Yet there is no statutory or regulatory requirement that a bank ... obtain or maintain officers' and directors' liability insurance."

*Id.* at 1553.

*American Casualty Co. v. Baker, supra,* also sustained the regulatory exclusion. That decision relied on *Muschany v. United States,* 324 U.S. 49, 65 S.Ct. 442, 89 L.Ed. 744 (1945), where the Court said:

---

7. In the policy issued (*i.e.,* October 1, 1985–1986) by ACCO to FMSL endorsement 16 provided:
   "GENERAL LIMITATION OF COVERAGE
   It is understood and agreed that the insurer shall not be liable to make any payment for Loss in connection with any claim made against the Insured (as defined in the Policy) based upon or attributable to
   . . . .
   3. Any claim made against any Director or Officer by any other Director or Officer or by the Institution defined in Clause 1(A) of the Policy."

"Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy."

*Id.* at 66, 65 S.Ct. at 451, 89 L.Ed. at 756 (citation omitted). *Baker* found no such definite indications in the statutes and regulations pertaining to the resolution of the affairs of insolvent financial institutions by regulatory and insuring governmental agencies.

The *Muschany* approach to public policy was also applied by the Sixth Circuit in *Federal Deposit Ins. Corp. v. Aetna Casualty & Sur. Co.,* 903 F.2d 1073 (6th Cir.1990), in sustaining the provision of a fidelity bond under which the bond terminated upon take over of the insolvent insured institution by federal regulators. The court expressly rejected the reasoning of the Eastern District of Tennessee, within that circuit, in *Federal Sav. & Loan Ins. Corp. v. Aetna Casualty & Sur. Co.,* 701 F.Supp. 1357, discussed above.[8]

In addition, recent unreported decisions have rejected FDIC's public policy contention. *See Fidelity & Deposit Co. v. Corner,* Civil No. H–89–0872 (S.D.Tex. May 31, 1991); *St. Paul Fire & Marine Ins. Co. v. Federal Deposit Ins. Corp.,* 765 F.Supp. 538 (D.Minn.1991); *Powell v. American*

---

8. Peculiar to the federal sphere is the 1989 amendment of 12 U.S.C. § 1821 dealing with the FDIC, which now provides:

"The conservator or receiver may enforce any contract, *other than a director's or officer's liability insurance contract or a depository institution bond,* entered into by the depository institution notwithstanding any provision of the contract providing for termination, default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver." 12 U.S.C.A. § 1821(e)(12)(A) (1989) (emphasis added). This statute was relied on by the Central District of California in *American Casualty Co. v. Baker* and by the Sixth Circuit in *Federal Deposit Ins. Corp. v. Aetna Casualty & Sur. Co.*

*Casualty Co.,* No. CIV–90–897–W, 1991 U.S.Dist. LEXIS 9910 (W.D.Okla. Feb. 26, 1991).

This Court's method of determining whether a contractual provision is contrary to public policy is not dissimilar to the analysis in the cases holding that the regulatory exclusion does not contravene federal public policy. This Court was presented with the contention that a liability policy's coverage provision, which in terms embraced an award of punitive damages, was unenforceable on public policy grounds in *First Nat'l Bank of St. Mary's v. Fidelity & Deposit Co.,* 283 Md. 228, 389 A.2d 359 (1978). We there quoted from *Patton v. United States,* 281 U.S. 276, 306, 50 S.Ct. 253, 261, 74 L.Ed. 854, 867 (1930), the following:

" 'The truth is that the theory of public policy embodies a doctrine of vague and variable quality, and, unless deducible in the given circumstances from constitutional or statutory provisions, should be accepted as the basis of a judicial determination, if at all, only with the utmost circumspection. The public policy of one generation may not, under changed conditions, be the public policy of another.' "

283 Md. at 239, 389 A.2d at 365.

This Court reviewed the differing opinions in the case law on the issue and evaluated the rationale. We noted that insuring against the discretionary penalty of double workers' compensation where a minor was injured was statutorily prohibited, but that there was no comparable prohibition against insurance for punitive damages. We considered the practical implications, particularly on owners of small businesses, of a judicially recognized public policy invalidating coverage against punitive damages. This Court concluded that, absent a General Assembly pronouncement on the subject, the coverage was enforceable. 283 Md. at 243, 389 A.2d at 367.

Here, the validity *vel non* of the regulatory exclusion has generated a difference of opinion in the cases, but we find the rationale sustaining the exclusion to be more per-

suasive. There was and is no Maryland statute requiring a state chartered savings and loan association to maintain D & O insurance, similar to the mandatory coverages for automobiles registered in this State. *See* Md.Code (1977, 1987 Repl.Vol.), § 17–103 of the Transportation Article. There is no statute which prohibits exclusion of D & O coverage for claims made against an officer or director by a regulatory agency as receiver for an association. In contrast, in the field of liability coverages, the General Assembly has both required provisions to be inserted in policies and prohibited certain other provisions, when it concluded public policy so required. *See* Md.Code (1957, 1991 Repl. Vol.), Art. 48A, §§ 480 through 482C.[9]

The statutes on which MDIF and the Court of Special Appeals relied are basically Md.Code (1980, 1986 Repl.Vol.), Title 9, Subtitle 7, and Title 10 of the Financial Institutions Article (FI). They deal with conservatorships and receiverships of savings and loan associations and with the creation of, and duties imposed on, MDIF. In general, these are the statutes enacted or modified at the special sessions of the General Assembly in 1985 to address the savings and loan crisis in this State. Particularly impressive to the Court of Special Appeals was MDIF"s power under FI § 9–708(d), "as receiver, [to] marshall and collect the assets and exercise all of the powers necessary to liquidate the business affairs of a failed savings and loan association." *Finci*, 82 Md.App. at 482, 572 A.2d at 1097. Here, before MDIF can

---

**9.** For example, a liability policy issued to a charitable institution must contain a provision estopping the insurer from pleading charitable immunity "as a defense to any claim covered by said policy." Art. 48A, § 480. No liability policy may contain any requirement for the payment of the loss by the insured. § 481. Homeowner's policies which contain medical expense coverage "for bodily injury caused by accident to the persons coming within the provisions thereof" must cover medical expenses incurred within three years from the date of the accident. § 481½. Uninsured motorist coverage must apply when the adverse vehicle's insurer becomes insolvent. § 481A. Health care malpractice insurance must contain provisions authorizing the insurer, without restriction, to compromise within policy limits. § 482A.

distribute as assets of FMSL the amounts claimed against ACCO by the assigning directors, MDIF must demonstrate that ACCO is liable on the policy.

The MDIF statutes do contain a declaration of public policy, but it points away from the direction in which MDIF would have us go. FI § 10–116 declares:

"It is the policy of this State that funds will be appropriated to [MDIF] to the extent necessary to protect holders of savings accounts in member associations, and to enable [MDIF] to meet its obligations under a hardship withdrawal plan or partial distribution of assets."

█ To invalidate a contractual provision based on statutorily based public policy, it is not necessary that the statute in terms prohibit the provision. The lesser the relationship becomes, however, between a statute and a contractual provision, the greater is the reluctance of this Court to invalidate the provision on the basis of the public policy embraced in statute. In *Maryland–Nat'l Capital Park & Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 386 A.2d 1216 (1978), a circuit court had invalidated the arena's covenant in a contract with the commission not to contest the taxability of the improvements on the arena's realty under the property tax system. The circuit court considered the covenant contrary to public policy, because the taxpayer relinquished the statutory right of appeal from real property assessments. This Court rejected that view, saying:

"Fearing the disruptive effect that invocation of the highly elusive public policy principle would likely exert on the stability of commercial and contractual relations, Maryland courts have been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where 'the common sense of the entire community would ... pronounce it' invalid. This reluctance on the part of the judiciary to nullify contractual arrangements on public policy grounds also serves to protect the public interest in having individuals

exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle."
*Id.* at 606, 386 A.2d at 1228–29 (citations omitted). To have held that the policy providing administrative appeals and judicial review overrode the arena's covenant would also have been to accept a principle that would have jeopardized many of the contractual mechanisms for alternate dispute resolution.

In the instant matter MDIF's standing to sue ACCO rests on the assignment from the judgment debtors, and only on that assignment, because FMSL in receivership will not, as a prelude to obtaining indemnification from ACCO, pay any part of the judgments which MDIF obtained against FMSL's directors and officers. Ordinarily, an assignee's contractual rights are no greater than those of the assignor. When MDIF's claim against ACCO is viewed as the claim of the assigning directors to have the judgments paid in the underlying action, there is not even arguably a public policy implication. This highlights that the public policy for which MDIF contends turns on the identity of the party who is seeking the insurance proceeds.

Stripped to its essentials, MDIF's argument is that the taxpayers of Maryland will have to pay any deficit in the insurance fund from which depositors in MSSIC insured, insolvent, Maryland savings and loan associations have been made whole, and that it is socially desirable to reduce that deficit to the maximum extent possible. The citizens of this State, and this Court, certainly endorse that concept in the abstract. But the problem presented here is the clash of that appealing result with the established policy of freedom of contract. For example, if, in lieu of having taken assignments from the judgment debtors, MDIF sought to garnish policy proceeds in the hands of ACCO, MDIF's theory would hold that the regulatory exclusion was extinguished, because "public policy" obliterates any contractual defense that stands between MDIF and the goal of obtaining maximum dollars.

There is no principled basis on which MDIF's result legally can be achieved without imperiling all contractual defenses of private persons that are good against creditors from whom the State seeks money. Every statute that places a duty on a public official or public agency to collect funds for the commonweal embodies a public policy that the funds should be collected to the maximum extent possible. That desirable goal does not mean that the Comptroller, for example, on that basis alone, can invalidate a tenancy by the entireties provision in a deed under which an individual, delinquent taxpayer economically holds an interest in realty. Similarly, if the regulatory exclusion is unenforceable because it prevents the State from collecting money, then the $3 million limit of D & O coverage in the ACCO policy is likewise invalid, and ACCO would stand with the promise to pay unlimited sums for which the directors and officers are liable.

Consequently, the trial court erred in granting MDIF's motion for summary judgment to the extent of striking the regulatory exclusion defense as to any claims by MDIF based on the policy in effect for October 1, 1985, to October 1, 1986. This holding will also control, on remand, the validity of the regulatory exclusion defense to the claims by Finci under the 1985–86 policy based on the *Seidel* action.

## II

Finci's complaint against ACCO, but not that of MDIF, contains two theories of the case as to which the regulatory exclusion is not defensive. Finci alleges that from the expiration of the policy ending October 1, 1985, through November 30, 1985, ACCO insured FMSL officials for D & O liability by a binder which continued in effect the coverage contained in the policy which, in terms, expired October 1, 1985. According to these allegations there was a period of ten or eleven days while MDIF was conservator of FMSL during which the regulatory exclusion was not in effect. Finci further alleges that, during that period, "coverage circumstances arose which indicated that a claim for a

wrongful act might be made," that ACCO "had knowledge thereof," and that, "[a]lthough written notice thereof was not given to" ACCO, "the Insurer was not prejudiced...."

A second theory, advanced in Count IV of Finci's complaint, is that the policy issued for the period ending October 1, 1986, was not a renewal of the policy for the prior period, because of the additional endorsements, including the regulatory endorsement. The policy issued for October 1, 1984–1985 provided that, upon a refusal to renew, the association could purchase a "tail" for claims made within the succeeding ninety days, based on "Wrongful Acts" within the policy period if the association, within ten days after non-renewal, requested the tail and paid the premium.[10] The policy further provided that "[i]f the Insurer elects not to renew this policy, the Insurer shall provide the Association for itself and as agent for the Directors and Officers with no less than thirty (30) days advance notice thereof." Finci alleged that ACCO "did not offer ... the opportunity to purchase an extension of coverage," resulting in "substantial economic damage."

Neither of these theories by Finci was considered by the circuit court in entering summary judgment. Finci's theories, whatever they might be, were held to be moot because MDIF had priority to all of the coverage under the D & O policy. Thus, we express no view on the merits of Finci's

---

**10.** The policy issued for October 1, 1984–1985 describes these features as the "Discovery Clause." It provides as follows:

"Discovery Clause—If the Insurer shall cancel or refuse to renew this policy, the Association shall have the right, upon payment of [twenty-five percent (25%) ] of the annual premium ... set forth in Item 5 of the Declarations, to an extension of the coverage granted by this policy with respect to any claim or claims which shall be made against the Directors or Officers during the period of [ninety (90) days] after the date of such cancellation or refusal to renew, but only with respect to any Wrongful Act committed before the date of such cancellation or non-renewal. A written request for this extension, together with payment of the appropriate premium, must be made within ten (10) days after the effective date of cancellation or non-renewal of the policy."

(Brackets indicate changes per policy endorsement No. 8).

allegations. *See Orkin v. Holy Cross Hosp. of Silver Spring, Inc.*, 318 Md. 429, 435, 569 A.2d 207, 210 (1990); *Three Garden Village Ltd. Partnership v. United States Fidelity & Guar. Co.*, 318 Md. 98, 107–08, 567 A.2d 85, 89 (1989); *Geisz v. Greater Baltimore Medical Center*, 313 Md. 301, 314 n. 5, 545 A.2d 658, 664 n. 5 (1988). It is sufficient to note that two defenses to Finci's theories were ruled upon on summary judgment. One is MDIF''s complete priority argument. The second is ACCO's argument based on the insured vs. insured exclusion that the circuit court rejected on public policy grounds. The Court of Special Appeals affirmed that rejection.

In this Part II, we consider the insured vs. insured exclusion. In so doing, the policy referred to is the D & O policy in the form as issued for the period October 1, 1984–1985.

### A

MDIF argues that the insured vs. insured exclusion is invalid for the same public policy reasons that, MDIF contends, invalidate the regulatory exclusion. For the reasons given in Part I.B, public policy does not invalidate the insured vs. insured exclusion.

### B

MDIF also argued to the circuit court that the insured vs. insured exclusion was ambiguous. No party sought to introduce evidence directed to resolving any ambiguity. Thus, MDIF argues, the ambiguity is to be resolved against ACCO. *See Mutual Fire, Marine & Inland Ins. Co. v. Vollmer*, 306 Md. 243, 251, 508 A.2d 130, 134 (1986); *Pacific Indem. Co. v. Interstate Fire & Casualty Co.*, 302 Md. at 405, 488 A.2d at 497. We agree.

Endorsement No. 5 to the policy reads:

"It is understood and agreed that the Insurer shall not be liable to make any payment for Loss ... which is based upon or attributable to any claim made against any

Director or Officer by any other Director or Officer or by the Institution defined in Clause 1(a) of the Policy ... except for a shareholders derivative action brought by a shareholder of the Institution other than an Insured."

The policy definitions and this endorsement are silent on claims made by a receiver, such as MDIF's claims in the *Seidel* action. *St. Paul Fire & Marine Ins. Co. v. Federal Deposit Ins. Corp., supra*, placed weight on that silence in holding the insured vs. insured exclusion to be ambiguous.

The strongest argument for including the claims made by MDIF in the *Seidel* action within the exclusion for claims made "by the Institution" is that the claims made by MDIF in the *Seidel* action were made by, or on behalf of, FMSL and were claims of FMSL. It was on this basis that the claim made by the FDIC against former officials of an insolvent bank were held to be embraced by an insured vs. insured exclusion in *Gary v. American Casualty Co.,* 753 F.Supp. 1547, 1555 ("[R]egardless of to whom the benefits of any recovery on a D & O policy by the FDIC or the FSLIC might indirectly or ultimately inure, their claims [in the underlying action] are claims of the financial institution which they acquired after failure of such financial institution by succession or purchase and are thus asserted in the capacity of assignee of the failed financial institution." (Footnote omitted)).

One difficulty with the forgoing analysis is that the insured vs. insured provision excludes claims made "by" the Institution and not "of" it. Looking at the policy as a whole, the purpose of the exclusion is to prevent collusive claims.[11] ACCO runs no risk of a collusive suit when a regulatory agency brings the underlying action as receiver of the association. This reasoning was persuasive to the courts in *American Casualty Co. v. Baker,* 758 F.Supp.

---

11. The circumstances in FMSL illustrate the potentiality for collusion. According to MDIF's complaint in the *Seidel* action, at least sixty-two percent of the stock of FMSL was owned by FMSL directors and officers.

1340 (C.D.Cal.1991) and in *Fidelity & Deposit Co. v. Zandstra*, 756 F.Supp. 429 (N.D.Cal.1990).

Reinforcing this interpretation is the language excising from the exclusion "a shareholders derivative action brought by a shareholder of the Institution other than an Insured." The claim in a shareholder's derivative suit is a claim *of* the institution, but it is not asserted *by* the institution, although it is asserted on behalf of the institution. The recovery in a shareholder's derivative suit inures directly to the corporation, and indirectly to the shareholders. Here, the claim by MDIF in the underlying action sought a recovery which would inure to the benefit of FMSL, in receivership. Out of that receivership estate, depositors and other creditors would benefit. Thus, if the purpose of the exclusion is satisfied even if a shareholder's derivative suit is involved, the intent of the parties is not to exclude claims for the benefit of FMSL. *Cf. Mount Hawley Ins. Co. v. Federal Sav. & Loan Ins. Corp.*, 695 F.Supp. 469, 481 (1987) (insured vs. insured exclusion in the policy expressly included "shareholders' derivative suits and/or representative class action suits").

For these reasons we hold that the insured vs. insured endorsement does not exclude MDIF's claims in *Seidel* from coverage.

### III

Whether Finci has a claim on the October 1, 1984–1985 policy is immaterial if MDIF has a viable claim under the same policy that entitles MDIF to all of the policy proceeds.

### A

We do not read MDIF's complaint to allege that the relevant coverage is under the terms of the policy issued October 1, 1984. On the other hand, it would be inequitable to permit Finci, on remand, alone to pursue claims based on theories which, if established, would also permit a recovery by MDIF. We conclude that "justice will be served by

permitting further proceedings...." Maryland Rule 8–604(d)(1).

Our mandate will vacate the judgments in favor of MDIF and remand *MDIF v. ACCO* to the Circuit Court for Baltimore City where MDIF, within thirty days from our mandate, may file an amended complaint against ACCO, asserting either or both of the theories, advanced by Finci, that are described in Part II of this opinion. In the event MDIF does not file an amended complaint within that time, or within any reasonable extension thereof which the circuit court may in its discretion grant, the Circuit Court for Baltimore City is directed to enter judgment for ACCO in the action by MDIF against ACCO.

### B

We must now decide whether Finci's claim on the 1984–85 policy under consideration is moot if MDIF demonstrates on remand that it is entitled to recover on that policy. If MDIF is successful on remand, the judgment of the Court of Special Appeals on the priority issue would bar Finci, who contends on this appeal that that judgment is erroneous.

The circuit court gave three reasons for granting summary judgment for MDIF as to the amount of damages in *MDIF v. ACCO.*

1. MDIF enjoyed the common law priority of the State of Maryland, as sovereign.

2. MDIF held a judgment against ACCO, but Finci did not. MDIF's status as a creditor whose claim had been reduced to judgment conferred priority over Finci, even if MDIF did not enjoy the common law priority of the sovereign.

3. Other reasons advanced by MDIF supported judgment. This incorporated MDIF's additional argument that FI § 10–120(b) conferred a statutory priority on MDIF.

FI § 10–120(b) provides in relevant part:

"(b) *Priority of judgments obtained by Fund; expenses of litigation; application of moneys recovered by Fund.*—Notwithstanding any other provision of law, in any action of the Fund as insurer, subrogee, conservator, or receiver against a shareholder, director, officer, employee, agent, or other person contributing to a loss at a member association or to enforce the terms of a net worth certificate or similar obligation:

(1) A judgment obtained by the Fund shall have priority over any other judgment lien on a defendant's real or personal property without need for further perfection or execution thereon;

(2) All attorneys' fees, costs, and expenses of the Fund for the litigation shall be assessed as part of any judgment in favor of the Fund; and

(3) All moneys recovered by the Fund as insurer or subrogee shall be first applied to repay any monetary advance by the State to the Fund, including any and all fees, costs, and expenses, to further the purposes of this title."

In affirming, the Court of Special Appeals agreed with each of the three grounds of decision relied upon by the trial court. The intermediate appellate court also seems to have added a fourth reason when it said:

"We conclude that the statutory laws of Maryland and the legislative history of their enactment indicate a clear intention on the part of the legislature to vest MDIF with plenary powers to protect the taxpayers of Maryland and the depositors of the State's savings and loan associations. In accordance with those powers, we hold that the legislature intended to provide priority to any judgments obtained by MDIF over any other judgments, in order that MDIF can fulfill its obligation to protect and reimburse depositors of failed savings and loan associations."

*Finci v. American Casualty Co.*, 82 Md.App. at 488, 572 A.2d at 1100–01.

■ MDIF's judgment against ACCO is being vacated by our mandate in this case. *See* Part I. Even if, following remand, both MDIF and Finci prove claims against ACCO on the issues remaining open for consideration, FI § 10–120(b) will not give MDIF's claim any priority over that of Finci. The priority under § 10–120(b) is limited, under the circumstances of the matter before us, to judgments of competing creditors against the same member of the class of persons who "contribut[ed] to a loss at a member associ-ation." No one contends that ACCO contributed to the loss at FMSL. Under the facts here, the "defendant[ ]" referred to in § 10–120(b)(1) is a member of the class described in the introductory paragraph of sub-subsection (b).

■ If the Court of Special Appeals intended to artic-ulate a fourth reason for affirming a MDIF priority, we do not agree. Procedurally, an appellate court ordinarily should limit its review of a summary judgment to the grounds assigned by the trial court for granting it. *See Orkin v. Holy Cross Hosp., supra*, 318 Md. at 435, 569 A.2d 207. Substantively, the reference in § 10–120(b)(1) to "any other judgment lien" is limited to liens on the property of a defendant within the class described in the introductory paragraph. Section 10–120(b) does not confer a priority on MDIF where, as here, MDIF and another creditor are adversaries as to the assets of a debtor who is not within that class.

■ Further, were it to develop on remand that MDIF obtained a judgment against ACCO while Finci's claim was still pending, awaiting determination, it would not follow from that fact alone that MDIF is entitled to priority to the D & O policy proceeds. ACCO is not insolvent, and payment of the claims by insureds under the D & O policy is not a distribution in insolvency. Moreover, a judgment for MDIF against ACCO would not create a lien in favor of MDIF on what the parties refer to as the "policy proceeds." The holder of a judgment must execute in order to obtain a lien on personal property. *See Illi, Inc. v. Margolis*, 267

Md. 30, 296 A.2d 412 (1972). The holder of a judgment that is not a lien on realty, and under which no execution has been had on personalty, is, absent special statute, a general, unsecured creditor in the same class as a creditor on open account. *See In the Matter of Urban Dev. Co. & Assocs.*, 452 F.Supp. 902 (D.Md.1978).

MDIF's remaining contention, that it enjoys a common law priority, requires close analysis. In its complaint against ACCO, MDIF basically alleged breach of the insuring agreement with FMSL. Of the pair of insuring agreements the one between ACCO and FMSL is not involved in this case. We have explained above how MDIF's standing to sue ACCO in contract rests on ACCO's insuring agreement with the directors and officers, three of whom assigned their claims against ACCO to MDIF. There are also other avenues available to MDIF for attempting to recover from ACCO based on the judgments against insured defendants in the *Seidel* action. As judgment holder, MDIF could garnish any credit in the hands of ACCO due to a *Seidel* judgment debtor. In addition, MDIF could execute on the contract right against ACCO of a *Seidel* judgment debtor, foreclose on that lien, itself acquire the right and, as owner of the contract right, sue ACCO.[12] Thus, MDIF's right to collect from ACCO is no greater than that of the insured individuals. MDIF's claims against ACCO are subject to defenses good against the insured *Seidel* defendants. Further, because MDIF settled with Finci, has no judgment against Finci, and obtained no assignment from Finci of his contract rights against ACCO, Finci's claim against ACCO is independently controlled by Finci.

Thus, we have two creditors, MDIF and Finci, each asserting the contract rights of insured individuals against

---

**12.** It is at least arguable that, subject to constitutional limitations, one effect of FI § 10–120(b)(1) is that MDIF obtained a lien, by virtue of the *Seidel* judgment, on personal property, including contract rights, of defendants within the class of those contributing to the loss at FMSL "without need for further perfection or execution" on the *Seidel* judgment.

ACCO, a common debtor whose contractual liability is limited to the $2,995,000 promised to be paid under the policy. It is at this point of competition that the common law priority of the sovereign is invoked by MDIF. A common law priority has been recognized, but not applied, in *Ghingher v. Pearson,* 165 Md. 273, 294–97, 168 A. 105, 113–14 (1933), *Public Indem. Co. v. Page,* 161 Md. 239, 156 A. 791 (1931), *State v. Williams,* 101 Md. 529, 61 A. 297 (1905), and *State v. Bank of Maryland,* 6 G. & J. 205 (1834).

*Ghingher v. Pearson,* 165 Md. 273, 168 A. 105, involved a provision in emergency state banking legislation during the Depression. It was held that the attempted grant to the State of a priority to recover its deposits was unconstitutional, despite the common law priority that the State enjoyed. Chief Judge Bond, in dissent, gave the following description of the common law priority.

"There is nothing obscure or complex about the rule; it hardly admits of complication. The priority was and is simply a relative position in respect to other creditors in appropriation of a debtor's assets; the State had first right when resorting to them. * * *

"The right of priority is against other creditors rather than against the debtor. *It does not affect the character of the debt.* Against the debtor the State stands in the position of an ordinary creditor, and unless its debt has been reduced to judgment, and the debtor has lands, the right of prior application does not interfere with his commerce in any of his assets, or with the acquisition of rights in other persons; the debt does not carry a lien, any more than would a like debt to a private creditor. And as freedom of commerce and of transfer of rights to others is not interfered with, so the assets may pass out of the reach of creditors, including the State."

165 Md. at 310, 168 A. at 119 (emphasis added).

The leading early opinion in this State on the sovereign's common law priority is that by Chief Judge Buchanan for the Court in *State v. Bank of Maryland,* 6 G. & J. 205. That case held that the priority no longer applied after

transfer of the debtor's assets under a deed of trust for the benefit of creditors. In answer to an argument by the State that it should be given priority in the trustee's distribution, the Court said:

"But the proposition amounts to this: that the deed is to be first set up as good and valid, in order to let in the State to a just proportion of the funds under it, and then to be overthrown to give to the State the entire fund, which cannot be; the deed cannot be good and bad at the same time. If void, and the State goes for the whole of its debt (and it can only do so on the ground of its being void,) it must claim adversely to the deed. If good (and we have said and endeavored to show that it is,) it has lost its preference, and can only take its just proportion according to the provisions of the deed. And taking under the deed, there is and can be no conflict of rights between the respective parties, each creditor's right being only to a just proportion, without disturbing the right or claim of any other. And when neither has a right to the proportion of the other, but each only to his own separate and distinct proportion, how can there be a conflict of rights. It is not like a case of the concurring rights of the king and subject creditor, each seeking to obtain and secure the whole or the same thing, [that] would be a case of conflict. As where there is an execution by the subject, and an execution or extent by the king, before the right or title of the subject is consummated; in such case the king's extent has the preference.[13] But if the property be fairly and *bona fide* changed, or the right of the individual creditor be completed before the extent, either by sale under *fi. fa.* or a valid conveyance to him, or to a trustee for his benefit; the extent coming afterwards will be unavailing. There being no point of time at which the two rights were in conflict, and nothing for the extent to act upon, after the property ceases to be the

---

13.  "Extent" is, "[i]n old English law, a writ of execution issuing from the exchequer upon a debt due the crown[.]"  Black's Law Dictionary (5th ed. 1979).

property of the debtor. The right of the State being only against the property of its debtor, and not against the property of its debtor's creditor."

*Id.* at 231–32.

Consequently, the conflict between MDIF and Finci does not involve the sovereign's common law priority at all. That priority might be relevant, for example, if ACCO were indebted to MDIF for $3 million, if ACCO were also indebted to Finci, if MDIF and Finci were all of ACCO's creditors, and if ACCO had only $3 million to pay all of its creditors. Here, assuming there will be coverage for MDIF's claims and for Finci's claims, ACCO cannot, under ordinary circumstances, be indebted for more than $3 million, less the deductible, under the D & O policy.

If the total of the "Losses" to insureds who are the source of MDIF's claim exceeds $2,995,000, ACCO may or may not be indebted for the entire $2,995,000 to MDIF, but the result will turn on the rights under the policy of the MDIF insureds versus the rights under the policy of Finci. If the entire $2,995,000 is payable to MDIF, it will not be because the indebtedness of ACCO to MDIF under the policy has been increased based on a MDIF priority. Similarly, Finci's "Losses" may or may not be the basis for a claim payable under the policy, but if Finci has a right to be paid under the policy, it will not be extinguished by a MDIF priority. Because ACCO's policy liability is limited, to the extent that Finci has any right to participate in the policy proceeds, the contractual rights that MDIF exercises produce a lesser amount of indebtedness of ACCO to MDIF.

The 1984–85 policy contains a provision that no party has argued, but that appears to bear on the issue. Paragraph 4, "LIMITS OF LIABILITY," subparagraph (c) reads:

"Claims based on or arising out of the same act, interrelated acts, or one or more series of similar acts, of one or more of the Directors or Officers shall be considered a single Loss and the Insurer's liability shall be limited to the limit of liability stated in Clause 4(b). In the event

that more than one Director or Officer is included in the same Loss, the total amount of such Loss and the retention shall be prorated among the Directors and Officers in proportion to their respective losses unless otherwise mutually agreed upon by the Directors or Officers and the Insurer."

We need not decide in this case what the result would be if both MDIF and Finci on remand proved covered claims under the 1984–85 policy. It is sufficient to hold that, in that event, MDIF does not have a priority. Accordingly, the circuit court erred in entering summary judgment against Finci, as to that policy year, on the ground of mootness of Finci's claims, if any.

## IV

ACCO additionally contends that the Court of Special Appeals erred by leaving undisturbed, and thereby affirming, the circuit court's rulings on summary judgment that certain defenses raised by ACCO were not defensive in this action as a matter of law.[14] In its brief as appellant to the Court of Special Appeals, ACCO identified three defenses as those which it claimed were erroneously stricken by the circuit court: the "sole capacity" defense; the "personal profit" exclusion; and the "dishonesty" exclusion. Each of these defenses is based upon a provision in the policy in effect for October 1, 1984–1985 and, thus, may be relevant on remand.

The "sole capacity" defense is derived from the policy definition of a "Wrongful Act." It is an act or omission by the directors or officers "in the discharge of their duties solely in their capacity as Directors or Officers of the Association." To support its summary judgment motion, MDIF relied upon the claim asserted in Count I of

---

**14.** The Court of Special Appeals said that ACCO's other defenses "pertained to parties who are not involved in the case *sub judice*," and that court did not address the questions. *Finci v. American Casualty Co.*, 82 Md.App. at 476 n. 8, 572 A.2d at 1094 n. 8.

the third amended complaint in *Seidel* which alleged negligent breach of duty by defendant directors and officers of FMSL and on the judgment entered on that count. That count's theory of liability was breach of duty by the directors and officers in their capacities as such. ACCO produced nothing which would generate a genuine dispute of material fact on this issue. The summary judgment was proper as to "sole capacity."

The "personal profit" defense is based upon a policy exclusion for loss in connection with a claim "based upon or attributable to the gaining in fact of any personal profit or advantage to which [the directors or officers] were not legally entitled." ACCO points out that in a portion of its complaint in *Seidel,* setting forth factual allegations common to all counts, MDIF referred to "speculative and highly risky real estate projects and commercial loans, which, in certain cases, involved the officers and directors of FMSL ... as risk free investors." MDIF then averred that "[a] primary purpose for this virtually uncontrolled lending spree was to line the pockets of the directors, officers and affiliates of FMSL with extravagant salaries, bonuses, fees, fringe benefits and investment opportunities...." This admission by MDIF, a party opponent, generates a sufficient factual issue to prevent summary judgment on the "personal profit" defense.

The third defense is based on the "dishonesty" exclusion. That exclusion relates to loss in connection with any claim

"brought about or contributed to by the dishonesty of the Directors or Officers. However, notwithstanding the foregoing, the Directors or Officers shall be protected under the terms of this policy as to any claims upon which suit may be brought against them, by reason of any alleged dishonesty on the part of the Directors or Officers, unless a judgment or other final adjudication thereof adverse to the Directors or Officers shall establish that acts of active and deliberate dishonesty commit-

ted by the Directors or Officers with actual dishonest purpose and intent were material to the cause of action so adjudicated."

MDIF explicitly disclaimed basing any part of its claim against ACCO on "Loss" incurred by defendants in *Seidel* who were found liable under a count of the complaint which alleged fraud. ACCO contends that it is not bound by the. jury verdict in *Seidel*. The insurer submits that it may look behind the verdict finding negligent breach of duty by directors and officers, and utilize proof in *Seidel* or evidence from any other source to sustain the defense. ACCO also contends that it was prevented from presenting evidence in support of the dishonesty exclusion because summary judgment was granted before the court entered any order cutting off discovery.

Because ACCO at trial would have the burden of proving the applicability of the dishonesty exclusion as an affirmative defense, ACCO on summary judgment, even where MDIF is the movant, must demonstrate that the dishonesty exclusion is a triable issue. *Geisz v. Greater Baltimore Medical Center,* 313 Md. at 330–31, 545 A.2d at 672 (1988) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). We are advised that *Seidel* was tried from August 31, 1987, through January 19, 1988. ACCO presented no evidence from the *Seidel* record in opposition to the MDIF motion. Nor has ACCO directed us to any place in the record where ACCO sought from the circuit court additional time to develop a factual issue concerning the dishonesty exclusion. Further, ACCO has not filed any affidavit stating the reasons why facts essential to justify opposition to the motion for summary judgment cannot be set forth. *See* Maryland Rule 2–501(d). Summary judgment was properly granted on the dishonesty exclusion.

JUDGMENTS OF THE COURT OF SPECIAL APPEALS REVERSED. CASES REMANDED TO THE COURT OF SPECIAL APPEALS WITH INSTRUCTIONS TO RE-MAND THESE CASES TO THE CIRCUIT COURT FOR

BALTIMORE CITY FOR FURTHER PROCEEDINGS
CONSISTENT WITH THIS OPINION. COSTS IN THIS
COURT AND IN THE COURT OF SPECIAL APPEALS
TO BE PAID BY STATE OF MARYLAND DEPOSIT IN-
SURANCE FUND CORPORATION.