656 A.2d 779

**CHANTEL ASSOCIATES, Joel David Chananie & Teresa Levitin**

v.

**MOUNT VERNON FIRE INSURANCE COMPANY.**

No. 71, Sept. Term, 1994.

Court of Appeals of Maryland.

April 13, 1995.

**132**

134

Glenn M. Cooper (Patricia M. Weaver, Paley, Rothman, Goldstein, Rosenberg & Cooper, Chtd., all on brief), Bethesda, for petitioner.

Robert K. Nead (Sandra B. Minton, O'Doherty, Nead, Hoffman & Karey, all on brief), Baltimore, Julie C. Janofsky (Ward, Janofsky & Truhe, P.A., all on brief), Towson, (Sidney G. Leech, Linda S. Woolf, Goodell, DeVries, Leech & Gray, Catherine A. Potthast, Smith, Somerville & Case, all on briefs), Baltimore, for respondent.

Robert E. Scott, Jr., Stephen S. McCloskey, Semmes, Bowen & Semmes, Baltimore, for amicus curiae Maryland Cas. Co.

H. Thomas Howell, David A. Carter, John S. Bainbridge, Jr., Kathleen D. Leslie, Charles J. Kresslein, Howell, Gately, Whitney & Carter, Towson, for amicus curiae American Ins. Assn.

Mark Kolman, Anderson Kill Olick & Oshinsky, P.C., Washington, DC, for Mid–America Legal Foundation, of counsel Irene C. Warshauer, Bhamati Viswanathan, Anderson Kill

Olick & Oshinsky, P.C., Martha Churchill, Mid–America Legal Foundation, of Chicago, IL.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

CHASANOW, Judge.

This appeal arises out of an action filed by Scottsdale Insurance Company (Scottsdale) against Chantel Associates (Chantel) seeking a declaration that Scottsdale had no duty to defend or indemnify Chantel in a tort action.[1] That tort action (hereinafter referred to as the *Epperson* action) was instituted in the Circuit Court for Baltimore City against Chantel[2] by Valerie McCree, individually and on behalf of her son, Napoleon Epperson, III, (Napoleon) and Lynelle McCree, individually and on behalf of her children, Donald Wilson, Jr. (Donald) and Quanna Wilson (Quanna) (hereinafter referred to collectively as the *Epperson* plaintiffs). The complaint and subsequent amendments filed in the *Epperson* action alleged that the plaintiffs were injured as a result of the exposure, ingestion and consumption of lead paint while residing at Chantel's property on 1224 West Lafayette Avenue in Baltimore.

The original complaint alleged that "[d]uring the time the infant [plaintiffs] resided in the [1224 West Lafayette Avenue] dwelling, the infant[s] ingested and consumed paint containing lead, and lead pigment thereby causing the infant [plaintiffs] to suffer the injuries, illness and infirmities hereinafter alleged." Although the original complaint did not specify a date when the initial injuries occurred, it alleged that the plaintiffs

---

1. Scottsdale also named Valerie McCree, Napoleon Epperson, III, Lynelle McCree, Donald Wilson, Jr. and Quanna Wilson, the plaintiffs in the tort action filed against Chantel, as defendants in this action.

2. Chantel Associates is a Maryland General Partnership whose sole partners are Joel David Chananie (Chananie) and Teresa Levitin (Levitin). Chananie and Levitin were also named as defendants in the tort action filed against Chantel. These parties will hereinafter be referred to collectively as Chantel.

"became seriously, painfully and permanently injured" on or about March, 1987. A further amendment by interlineation to the original complaint alleged that Napoleon and Donald began to permanently reside at 1224 West Lafayette Avenue in September, 1985 and that Quanna resided at the dwelling from the time of her birth in May, 1986. The amendment further alleged that:

"From the beginning of the time that each child resided in the premises each was exposed to lead paint, lead chips and lead dust which were ingested in some manner by the children. *Each, from the beginning of their residence was injured by this exposure,* as the ingestion of lead began a process of cellular damage." (Emphasis added).

During the period of time relevant to this appeal, four insurers provided liability insurance coverage to Chantel. Those insurers were Empire Indemnity Insurance Company (Empire), Mount Vernon Fire Insurance Company (Mount Vernon), Scottsdale, and Allstate Insurance Company (Allstate). Empire issued a general liability insurance policy to Chantel which provided coverage from April 1, 1984 through April 1, 1985. Mount Vernon issued a general liability insurance policy to Chantel which provided coverage from April 1, 1985 through March 12, 1986. Scottsdale issued two consecutive general liability insurance policies to Chantel which provided coverage from March 12, 1986 through March 12, 1988. Allstate issued a personal umbrella insurance policy to Chananie and Levitin on February 10, 1983 which was renewed annually through February 10, 1993. The Allstate personal umbrella policy provided "excess" liability coverage for certain "occurrences." [3]

Each of the general liability insurance policies issued to Chantel required the insurer to:

---

3. Allstate also issued a homeowner's policy to Chananie and Levitin during this period; however, this policy did not provide coverage for the *Epperson* action.

"pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of ... bodily injury ... caused by an occurrence...."

The policies define "bodily injury" as:

"bodily injury, sickness or disease...."

The policies define an "occurrence" as:

"an accident, including continuous or repeated exposure to conditions, which results in bodily injury ... neither expected nor intended from the standpoint of the insured."[4]

Upon receipt of the *Epperson* complaint, Chantel notified each insurer of the complaint filed against it and requested that each insurer provide it with representation in the *Epperson* action. Mount Vernon and Allstate refused to defend Chantel. Scottsdale responded to Chantel's request for representation by informing it that both its policies contained exclusions from coverage for injuries arising out of lead paint poisoning;[5] however, after Chantel disputed the validity of the lead paint poisoning exclusions, Scottsdale undertook Chantel's defense in the *Epperson* action. Scottsdale reserved its right to cease defending Chantel as soon as it could obtain a judicial determination that the lead paint poisoning exclusions were valid. Empire retained counsel to defend Chantel in the *Epperson* action but shortly thereafter Scottsdale took over the entire defense.

After undertaking Chantel's defense in the *Epperson* action, Scottsdale filed a declaratory judgment action in the Circuit Court for Baltimore City against Chantel and the *Epperson* plaintiffs seeking a determination that it had no duty to defend or indemnify Chantel in the *Epperson* action based on its policies' exclusions from coverage for injuries arising out of

---

4. This definition of "occurrence" is contained in the Mount Vernon insurance policy. The other insurance policies contain virtually identical definitions of "occurrence."

5. The first policy provided that Scottsdale "should not be obligated to make any payment or defend any claim arising out of lead paint poisoning ... injuries." The second policy provided that the "policy excludes any and all losses arising out of lead paint poisoning."

lead paint poisoning. Scottsdale later amended its declaratory judgment action, joining Empire, Allstate and Mount Vernon as defendants, and requesting reimbursement for costs it incurred in defending the *Epperson* action from those insurers found to have a duty to defend Chantel in that action. Chantel then filed a motion for summary judgment seeking a declaration that Allstate, Empire, and Mount Vernon were all under a duty to defend Chantel. The motion also sought a declaration that Mount Vernon and Allstate were under a duty to indemnify Chantel up to the limits of their respective insurance policies. Chantel's motion was supported by an affidavit of psychologist Stephen R. Schroeder which stated:

"An injury is the alteration of structure or function of a cell, tissue or organ. Physical or chemical damage to the body which may be detectable only on a microscopic or subclinical level also constitute[s] an injury. . . . [T]here are injuries to cells, tissues and organs caused by exposure to lead paint, lead paint chips, lead paint fumes, and/or lead paint dust, even though the injuries may not be noticeable to a harmed individual or diagnosable by a clinician until some later point in time.

Lead . . . is especially harmful to the developing brain and nervous systems of fetuses. . . . There is probably no safe threshold at which lead has no effect. . . . [C]hildren under . . . age three, whose brains are rapidly growing and developing are most vulnerable to damage by low levels of lead exposure.

\*     \*     \*     \*     \*     \*

There is general agreement that human infants and toddlers below the age of three years are at special risk because of *in utero* exposure. . . . Cumulative exposure has many central nervous system effects relatively immediately. These effects can accumulate and children show great variability in their response to different amounts of lead ingestion. Thus they may be suffering from the effects of cumulative low level lead exposure years before they are clinically observable.

Thus, it is my opinion ... that exposure to lead produces both direct and indirect damage to the cells, tissues and organs of the body *that begin immediately or shortly after exposure,* notwithstanding the fact that the symptoms, especially at low levels of exposure, may not be apparent until much later, sometimes years after exposure." (Emphasis added).

Empire, Mount Vernon, and Allstate also filed summary judgment motions, each seeking a declaration that it was under no duty to defend or indemnify Chantel in the *Epperson* action.

After a hearing on the motions for summary judgment, the circuit court (Rombro, J.) issued an order granting Scottsdale's requested relief and declaring that Scottsdale's "policy clearly had an exclusion for both indemnification and ... defense of any lead paint suit [a]nd that was ... clearly the understanding between the parties." The court granted Empire's motion for summary judgment and held that it had no duty to defend or indemnify Chantel in the *Epperson* action because "clearly, the policy expired on April 1, 1985.... Empire cannot possibly be responsible because ... [the *Epperson* plaintiffs] weren't even living in the premises" when the policy was in effect. The court denied Mount Vernon's motion for summary judgment and declared that Mount Vernon must defend Chantel "against all personal injury lead-related claims brought by any or all of the plaintiffs in the *Epperson* case." The court further ordered Mount Vernon to indemnify Chantel for the "amount of any judgments rendered against [Chantel] ... in favor of any or all of the plaintiffs" in the *Epperson* action. The court granted Allstate's motion for summary judgment in part on the ground that its homeowner's policy did not provide coverage to Chantel in the *Epperson* action. The court denied the remainder of Allstate's motion and held that its personal umbrella insurance policy provided coverage to Chantel in the *Epperson* action.[6]

---

6. The circuit court dismissed the argument that the Chantel property was excluded under the personal umbrella policy's business exclusion on the grounds that the business exclusion did not include "one, two,

The court held, however, that Allstate had no duty to defend Chantel in the *Epperson* action because Allstate's policy provides that it does "not have to defend when there is [an] underlying policy" and that underlying policy was provided by Mount Vernon. The court held that although Allstate did not have a duty to defend Chantel, Allstate must indemnify Chananie and Levitin under the personal umbrella policy for any judgments entered against them in the *Epperson* action "to the extent that there is any recovery above [Mount Vernon's] basic underlying coverage." Finally, the court held that Mount Vernon must reimburse Chantel and Scottsdale for all costs incurred in defending the *Epperson* action and that Mount Vernon must reimburse Chantel for all costs it incurred in litigating the declaratory judgment action.

Mount Vernon appealed the circuit court's judgment to the Court of Special Appeals which affirmed the circuit court's judgment that Mount Vernon had a duty to defend Chantel in the *Epperson* action. The Court of Special Appeals held, however, that Mount Vernon's duty to defend did not arise until the *Epperson* plaintiffs filed their further amendment by interlineation on July 9, 1992. *See Mount Vernon Ins. v. Scottsdale Ins.*, 99 Md.App. 545, 559, 638 A.2d 1196, 1202 (1994). The court also held that Mount Vernon's duty to defend Chantel extends only to claims brought on behalf of Napoleon and Donald because Quanna did not begin to reside at the Chantel property until after the Mount Vernon policy expired. *Mount Vernon Ins.*, 99 Md.App. at 559, 638 A.2d at 1202–03. The intermediate appellate court reversed the circuit court's judgment that Mount Vernon had a duty to indemnify Chantel under its insurance policy and held that "[n]o duty to indemnify arises until the *Epperson* plaintiffs have obtained a judgment against Chantel." *Mount Vernon Ins.*, 99 Md.App. at 561, 638 A.2d at 1204. The court also held that if it is determined that Mount Vernon is obligated to indemnify Chantel, Mount Vernon should be given an opportu-

three, or four family residence premises [that] the insurer owns, controls, rents or holds for rental."

nity to demonstrate that it is "obligated to make only a partial indemnification." *Mount Vernon Ins.*, 99 Md.App. at 562, 638 A.2d at 1204. The intermediate appellate court reversed the circuit court's judgment that Mount Vernon must reimburse Scottsdale for attorneys' fees incurred while defending the *Epperson* action. The court held, however, that Chantel is entitled to reimbursement from Mount Vernon for any costs Chantel incurred in defending the *Epperson* action and litigating the declaratory judgment action subsequent to the time that Mount Vernon's duty to defend Chantel arose. *Mount Vernon Ins.*, 99 Md.App. at 564, 638 A.2d at 1205. We granted certiorari to consider whether Mount Vernon has a duty to defend and/or indemnify Chantel in the *Epperson* action.[7]

## I.

In *Brohawn v. Transamerica Ins. Co.*, 276 Md. 396, 347 A.2d 842 (1975), we held that an insurance company has a duty to defend its insured for all claims which are potentially covered under an insurance policy. In *Brohawn* we stated:

> "The obligation of an insurer to defend its insured under a contract provision . . . is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." (Citations omitted).

276 Md. at 407–08, 347 A.2d at 850. Our recent opinion in *Aetna v. Cochran*, 337 Md. 98, 651 A.2d 859 (1995), further clarified the *Brohawn* potentiality rule and held that an in-

---

7. There was no petition for certiorari on the issue of whether Scottsdale, Empire or Allstate had a duty to defend or indemnify Chantel in the *Epperson* action. Thus, we do not consider whether any of these insurers owe a duty to defend or indemnify Chantel in the *Epperson* action.

sured may establish a potentiality of coverage under an insurance policy through the use of extrinsic evidence so long as the "insured demonstrates that there is a reasonable potential that the issue triggering coverage will be generated at trial." *Aetna,* 337 Md. at 112, 651 A.2d at 866. Thus, according to our holdings in *Brohawn* and *Aetna,* an insurer's duty to defend is triggered when an examination of the policy, the complaint and appropriate extrinsic evidence discloses a potentiality of coverage under an insurance policy.

In determining coverage under an insurance policy, we initially focus on the terms of the insurance policy to determine the scope and limitations of its coverage. *See Mitchell v. Maryland Casualty,* 324 Md. 44, 56, 595 A.2d 469, 475 (1991) (stating that in a declaratory judgment action brought to determine coverage under an insurance policy, " 'it is the function of the court to interpret the policy and decide whether or not there is coverage' ") (quoting *St. Paul Fire & Mar. Ins. v. Pryseski,* 292 Md. 187, 194, 438 A.2d 282, 286 (1981)); *Mut. Fire, Marine & Inland Ins. v. Vollmer,* 306 Md. 243, 250, 508 A.2d 130, 133 (1986). In construing the terms of the insurance contract, we must accord the terms their "customary, ordinary, and accepted meaning." *Mitchell,* 324 Md. at 56, 595 A.2d at 475; *Cheney v. Bell National Life,* 315 Md. 761, 766, 556 A.2d 1135, 1138 (1989). In *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 488 A.2d 486 (1985), this Court stated that:

"An insurance contract, like any other contract, is measured by its terms unless a statute, a regulation, or public policy is violated thereby. To determine the intention of the parties to the insurance contract . . . we construe the instrument as a whole . . . [and] should examine the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution." (Citations omitted).

302 Md. at 388, 488 A.2d at 488.

With these principles of construction in mind, we note that Mount Vernon's general liability insurance policy requires it to "pay on behalf of the insured all sums which the insured shall

become legally obligated to pay as damages because of . . . bodily injury . . . caused by an occurrence." Bodily injury is defined in the policy as "bodily injury, sickness or disease." The policy defines an "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in bodily injury . . . neither expected nor intended from the standpoint of the insured."

▆ In *Mitchell*, we were called upon to interpret the term "bodily injury" under a general liability insurance policy. In so doing, we relied on the definitions accorded that term by other courts. We relied on *Zurich Ins. v. Northbrook Excess & Surplus*, 145 Ill.App.3d 175, 98 Ill.Dec. 512, 520, 494 N.E.2d 634, 642 (1986), which held that "the plain meaning of the term 'bodily injury' is harm or damage of, or relating to the body." We further looked to *Ins. Co. of North America v. Forty-Eight Insulations*, 633 F.2d 1212, 1222 (6th Cir.1980), which noted that "for insurance purposes, courts have long defined the term 'bodily injury' to mean 'any localized abnormal condition of the living body'" (citing Appleman, *Insurance Law and Practices* § 355 (1965)). *See Mitchell*, 324 Md. at 58–62, 595 A.2d at 476–78. Although we were interpreting the term "bodily injury" in the context of asbestos-related injuries in *Mitchell*, we accorded the term its "ordinary and accepted" definition under a general liability insurance policy. Because the language in the Mount Vernon policy is identical to the policy language in *Mitchell*, the term "bodily injury" must be accorded the same meaning in the instant case as it was accorded in *Mitchell*. Thus, harm or damage of, or relating to the body or any localized abnormal condition of the living body constitutes a bodily injury under the Mount Vernon policy.

▆ Having established the definition of "bodily injury" under the Mount Vernon policy, we must now determine if the *Epperson* plaintiffs suffered "bodily injury." According to the further amendment by interlineation to the complaint, the *Epperson* plaintiffs were "exposed to lead paint, lead chips and lead dust [from the beginning of their residence and each child] . . . was injured by this exposure, as the ingestion of

lead began a process of cellular damage." In addition, Dr. Schroeder's undisputed affidavit states:

> "An injury is the alteration of structure or function of a cell, tissue or organ. Physical or chemical damage to the body which may be detectable only on a microscopic or subclinical level also constitute[s] an injury.
>
> \* \* \* \* \* \*
>
> Exposure to lead produces both direct and indirect damage to the cells, tissues and organs of the body that begin immediately or shortly after exposure ...,
>
> \* \* \* \* \* \*
>
> [and that] human infants and toddlers below the age of three years are at special risk because of *in utero* exposure."

The *Epperson* complaint, along with Dr. Schroeder's undisputed affidavit, leads to the conclusion that the "direct and indirect damage to the cells, tissues and organs," caused by the *Epperson* plaintiffs' exposure to lead constitutes a "bodily injury" as that term was defined in *Mitchell.* In fact, the record in the instant case establishes that the "bodily injury" suffered by the *Epperson* plaintiffs' exposure to lead is similar to the "bodily injury" suffered in *Mitchell* where we held that " 'bodily injury' occurs when asbestos is inhaled and retained in the lungs." *Mitchell,* 324 Md. at 62, 595 A.2d at 478. Additionally, according to Dr. Schroeder's uncontradicted affidavit, "bodily injury" occurred immediately or shortly after exposure, and in Quanna's case, through *in utero* exposure. Thus, the record in the instant case establishes that the *Epperson* plaintiffs suffered "bodily injury," immediately or soon after their exposure to the chipping and flaking lead paint at the Chantel property during the Mount Vernon policy period and that this "continuous and repeated exposure" resulted in bodily injury constituting an "occurrence" triggering coverage under the Mount Vernon policy.[8]

---

8.  We note that the only evidence in the record in the instant case is the complaint which states that the *Epperson* plaintiffs were exposed to

■ Based on the complaint and the record, we agree with the circuit court and find that the *Epperson* action is potentially covered under the Mount Vernon insurance policy, and Mount Vernon was under a duty to defend Chantel from the inception of that action for claims brought by all *Epperson* plaintiffs. As established above, the alleged lead-related injuries potentially occurred from the time Napoleon and Donald began residing at the Chantel property in September, 1985, which was within the Mount Vernon policy period. Additionally, although Quanna was not born until two months after the Mount Vernon policy expired, her lead-related injuries potentially occurred through *in utero* exposure prior to the expiration of the Mount Vernon policy. Thus, under the potentiality test established in *Brohawn*, Mount Vernon had a duty to defend Chantel in the *Epperson* action for claims brought on behalf of all *Epperson* plaintiffs from the time the action was commenced.

We disagree with the Court of Special Appeals's determination that Mount Vernon's duty to defend did not arise until the *Epperson* plaintiffs filed the further amendment by interlineation on July 9, 1992. *See Mount Vernon Ins.*, 99 Md.App. at 559, 638 A.2d at 1202. We have held that any doubt as to whether there is a potentiality of coverage under an insurance policy is to be resolved in favor of the insured. *See U.S.F. & G. v. Nat. Pav. Co.*, 228 Md. 40, 55, 178 A.2d 872, 879 (1962).

---

chipping and flaking lead paint at the Chantel dwelling from the beginning of their residence and the uncontroverted affidavit of Dr. Stephen Schroeder which states that lead-related injury occurs upon exposure to lead. Because the record in the instant case contains only one view of when lead-related injury occurs, we do not determine whether exposure to chipping and flaking lead paint resulting in bodily injury is the sole trigger of coverage in all lead-related injury cases. *See, e.g., Mitchell v. Maryland Casualty*, 324 Md. 44, 62, 595 A.2d 469, 478 (1991) (noting that manifestation of the bodily injury is not the sole trigger of coverage in asbestos-related injury cases and holding that coverage under a general liability insurance policy is, at a minimum, "triggered upon exposure to ... asbestos ... during the policy period by a person who suffers bodily injury as a result of that exposure"); *Harford County v. Harford Mut. Ins.*, 327 Md. 418, 435, 610 A.2d 286, 294–95 (1992) (stating that "manifestation" of property damage is not the sole trigger of coverage in environmental pollution cases).

The original complaint filed in the *Epperson* action alleged that "[d]uring the time the infant [plaintiffs] resided in the [1224 West Lafayette Avenue] dwelling, the infant[s] ingested and consumed paint containing lead and lead pigment ... causing the ... injuries, illness and infirmities hereinafter alleged." Although the complaint did not allege the date of initial injury, the allegations leave open the potentiality that the *Epperson* plaintiffs' lead-related injuries occurred during the Mount Vernon policy period. *See, e.g., U.S.F. & G.*, 228 Md. at 54–55, 178 A.2d at 879 (noting that although the declaration in the case did not allege every fact necessary to establish coverage, there was enough to indicate a potentiality that the alleged injuries were covered). Thus, the allegations in the *Epperson* complaint were sufficient to put Mount Vernon on notice that if Chantel were held liable in the *Epperson* action, there was a potentiality that the lead-related injuries occurred during Mount Vernon's policy period. Therefore, Mount Vernon had a duty to defend Chantel in the *Epperson* action from the time the action was commenced.

## II.

The next issue we must consider is whether the Court of Special Appeals properly held that Mount Vernon's duty to indemnify Chantel for any liability Chantel incurred in the *Epperson* action can be determined only after a final judgment has been entered in that action. We hold that the circuit court properly resolved the duty to indemnify in the instant case in the declaratory judgment action. We note that in the circuit court, all parties agreed that a determination of the indemnification issue was appropriate for disposition in the declaratory judgment action. Furthermore, the parties did not argue the inappropriateness of such disposition on appeal to the Court of Special Appeals. Nevertheless, the intermediate appellate court considered the issue and held that Mount Vernon's duty to indemnify can be determined only after "the *Epperson* [action] has proceeded to judgment." *See Mount Vernon Ins.*, 99 Md.App. at 561, 638 A.2d at 1204.

In discussing the appropriateness of resolving the duty to indemnify in a declaratory judgment action, we noted in *Brohawn, supra,* that:

"A declaratory judgment action prior to the trial of a tort action against the insured may under some circumstances be a valuable means of resolving questions of policy coverage where those questions are independent and separable from the claims asserted in a pending suit by an injured third party.

\* \* \* \* \* \*

But where . . . the question to be resolved in the declaratory judgment action will be decided in [a] pending action[ ], it is inappropriate to grant a declaratory judgment." (Citation omitted).

276 Md. at 405–06, 347 A.2d at 848–49; *see also Allstate v. Atwood,* 319 Md. 247, 254–55, 572 A.2d 154, 157 (1990) (stating that "declaratory judgments in advance of tort trials, to resolve issues presented in pending tort cases, should be rare"); *Maryland Auto. Ins. Fund v. Sun Cab Co.,* 305 Md. 807, 810, 506 A.2d 641, 643 (1986) (noting that an issue "squarely presented for resolution in the tort action[ ]," was appropriately refused consideration in a declaratory judgment action).

In *Brohawn,* a declaratory judgment action to determine coverage was prohibited because the issue in the declaratory judgment action, i.e. whether the defendant acted negligently or intentionally, would be fully litigated in the underlying tort action. *See Brohawn,* 276 Md. at 405–06, 347 A.2d at 848–49. In contrast, the facts necessary to determine the ultimate liability of Mount Vernon, i.e. the dates on which the lead-related injuries occurred, will almost certainly not be determined in the trial of the *Epperson* action. The *Epperson* plaintiffs need only prove that they suffered lead-related injuries while residing at the Chantel dwelling—there is simply no reason for the *Epperson* plaintiffs to present evidence as to the date when the lead-related injuries occurred. In fact, as the circuit court noted in the instant case, "[o]ne of the problems is, how would a jury determine, if [the *Epperson*

action] goes to trial, as to the date of the injury or the manifestation of the injury." *See, e.g., Harford Mut. Ins. v. Jacobson,* 73 Md.App. 670, 679 n. 4, 536 A.2d 120, 124 n. 4 (1988) (distinguishing the declaratory judgment action in the case from that prohibited in *Brohawn* and noting that the underlying tort action would have decided if the insured was liable, but "it would not have resolved the issue of *when* the actual injuries first took place") (emphasis in original). Thus, because the issue of when the lead-related injuries first occurred is "independent and separable from the claims asserted" in the *Epperson* tort action, the duty to indemnify is appropriate for resolution in a pre-trial declaratory judgment action. *See Brohawn,* 276 Md. at 405, 347 A.2d at 848; *see also Atwood,* 319 Md. at 255, 572 A.2d at 158.

Furthermore, prohibiting a declaratory judgment action prior to the trial of an underlying tort action, where the issue of coverage to be resolved in the declaratory judgment action is independent and separable from the issues to be decided in the underlying tort action, would have the effect of hindering attempts at settlement. In *ACandS, Inc. v. Aetna Cas. & Sur. Co.,* 666 F.2d 819 (3rd Cir.1981), the United States Court of Appeals for the Third Circuit initially determined that declaratory relief was appropriate because "[t]he factors that will determine the relative duties and benefits under the insurance contract are independent of the underlying claims...." 666 F.2d at 822–23. The court further noted that:

"It would turn the reality of the claims adjustment process on its head to hinge justiciability of an insurance agreement on the maturation of a suit to a judgment when the overwhelming number of disputes are resolved by settlement. The respective interests and obligations of insured and insurers, when disputed, require determination much in advance of judgment since they will designate the bearer of ultimate liability in the underlying cases and hence the bearer of the onus and risks of settlement.... To delay for the sake of more concrete development would prevent the litigants from shaping a settlement strategy and thereby

avoiding unnecessary costs. [D]eclaratory judgment relief was intended to avoid precisely the 'accrual of avoidable damage to one not certain of his rights.'" (Citation omitted).

*ACandS,* 666 F.2d at 823.

■ Thus, we hold that an issue of insurance coverage which is "independent and separable" from the issues to be litigated and decided at the tort trial may be appropriate for resolution in a declaratory judgment action and therefore, the circuit court properly considered Mount Vernon's duty to indemnify in the instant case. We note, however, that it is within the trial court's discretion to defer resolution of an issue presented in a declaratory judgment action until the time of trial of the underlying tort action, even if that issue is one which is "independent and separable" from the issues to be resolved at the underlying tort trial. *See Brohawn,* 276 Md. at 406, 347 A.2d at 848.

Having determined that the duty to indemnify was properly considered in the declaratory judgment action in the instant case, we must now determine whether the circuit court properly determined that Mount Vernon has a duty to indemnify Chantel in the *Epperson* action. We agree with the circuit court that Mount Vernon has a duty to indemnify Chantel in the *Epperson* action. The record before the circuit court in the instant case reflects that Napoleon and Donald's lead-related injuries occurred immediately or soon after moving into the Chantel dwelling in September, 1985, which was within the Mount Vernon policy period. Additionally, according to Dr. Schroeder's undisputed affidavit, Quanna's lead-related injuries occurred while she was *in utero,* also during the Mount Vernon policy period.

■ Mount Vernon had the opportunity to present evidence to contradict the affidavit of Dr. Schroeder which stated that the lead-related injuries occurred immediately or soon after exposure to lead. In its summary judgment motion, however, Mount Vernon provided no affidavit to contradict the opinions contained in Dr. Schroeder's affidavit. Under Mary-

land's summary judgment rule, "an opposing party who desires to controvert any fact contained in [the affidavit or other statement under oath] may not rest solely upon allegations contained in the pleadings, but shall support the response by an affidavit or other written statement under oath." Maryland Rule 2–501; *see also Beatty v. Trailmaster*, 330 Md. 726, 737, 625 A.2d 1005, 1011 (1993) (noting that "in order to defeat a motion for summary judgment, the opposing party must show that there is a genuine dispute as to a material fact by proffering facts which would be admissible in evidence").

In light of the evidence on the record in the instant case, we agree with the circuit court that "Dr. Schroeder's affidavit . . . is sufficient to bring the children within the period of time that Mount Vernon had the policy." Thus, we find that Mount Vernon has a duty to indemnify Chantel up to the limits of its policy for any recovery the *Epperson* plaintiffs obtain against Chantel. We also note that the Court of Special Appeals determined that Mount Vernon should be permitted to demonstrate that any obligation it may have to indemnify Chantel should be allocated. *See Mount Vernon Ins.*, 99 Md.App. at 561, 638 A.2d at 1204. Sharing the obligation to indemnify was never raised by any party, including Mount Vernon, at either the trial court or at the Court of Special Appeals. Mount Vernon was provided with the opportunity to argue for shared indemnification at the circuit court and chose not to do so. Thus, we do not consider this issue in this appeal.

### III.

We note that although Scottsdale and Empire argue in their briefs to this Court that they should be reimbursed for costs incurred in defending the *Epperson* action and litigating the declaratory judgment action, the issue of reimbursement of costs was not raised in the petitions for certiorari to this Court. Thus, we do not consider this issue in the instant case.

### IV.

We hold that Mount Vernon had a duty to defend Chantel from the inception of the *Epperson* action for claims brought

by all *Epperson* plaintiffs. We also hold that Mount Vernon has a duty to indemnify Chantel up to the limits of its policy for any liability Chantel incurs in the *Epperson* action.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART AND CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REINSTATE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY RESPONDENT MOUNT VERNON FIRE INSURANCE COMPANY.*