**HOME EXTERMINATING COMPANY, INC., t/a Home Paramount Pest Control Companies, et al., Plaintiffs,**

v.

**ZURICH–AMERICAN INSURANCE GROUP, Defendant.**

**Civil No. AMD 95–3212.**

United States District Court, D. Maryland.

April 10, 1996.

**319**

Ernest Cornbrooks, III, Webb, Burnett, Jackson, Cornbrooks & Wilbur, Salisbury, MD, for plaintiffs.

Everett Charles Dann, Jr., Goodell, DeVries, Leech & Gray, Baltimore, MD, Christine Ella Connelly, Wiley Rein & Feilding, Washington, DC, Robin R. Cockey, Salisbury, MD, for defendant.

## MEMORANDUM OPINION

DAVIS, District Judge.

This is a declaratory judgment action calling for the interpretation of a pollution exclusion clause, and a closely-related saving endorsement, contained in a commercial general liability insurance policy ("the policy").

(i)

Home Exterminating Company, Inc., t/a Home Paramount Pest Control Companies and Home Paramount Pest Control Company, Inc., t/a Home Paramount Pest Control Companies and Jeffery Holiday, one of its employees (collectively "insureds"), the plaintiffs in this action, are defendants in a pending state tort action styled *Fopma v. Home Exterminating, Inc.*, ("*Fopma* action") in the Circuit Court for Worcester County, Maryland. The insureds are in the business of pest extermination and fumigation. Defendant Zurich–American Insurance Group ("insurer")[1] insured plaintiffs pursuant to the policy during the time period involved in the *Fopma* action. The insurer denied coverage for the claims alleged in the *Fopma* action, relying upon an asserted "violation of law" exception to the endorsement otherwise providing coverage for personal injuries and property damage caused by the negligence of the insureds in their handling of "pollutants," i.e., pesticides.

In October 1995, the insureds initiated this declaratory judgment action in state court, seeking to establish that the insurer has a duty to defend and to indemnify them under the policy with respect to the *Fompa* action. This Court has removal jurisdiction under 28 U.S.C. §§ 1332, 1441.

Pending before the Court are Mr. and Mrs. Fopmas' (the plaintiffs in the underlying action) unopposed motion to intervene, which shall be granted,[2] and, on the merits, the parties' cross-motions for summary judgment. No hearing is necessary. Local Rule 105.6 (D.Md.1995). As there are no genuine issues of material fact in dispute, summary judgment is appropriate. Fed.R.Civ.P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). For the reasons set forth below, the insureds' and the Fopmas' motions for summary judgment shall be granted, and the insurer's motion for summary judgment shall be denied.

(ii)

Under Maryland law, the determination by a court of the existence of a duty to

---

1. Although there is some confusion in the pleadings as to the identity of the proper carrier, no real issue has been raised in this regard by any party.

2. *See Teague v. Bakker*, 931 F.2d 259 (4th Cir. 1991).

defend turns primarily on the allegations contained in the underlying complaint. *See, e.g., Brohawn v. Transamerica Ins. Co.,* 276 Md. 396, 347 A.2d 842 (1975). Thus, the "facts" relevant to coverage are those alleged in the Fopmas' complaint[3] in the underlying action. Those allegations are as follows:

Dorothy and Carl Fopma own a home in Ocean City, Maryland. Fopmas' Compl. ¶ 1. During the spring of 1994, their property became infested with ants. *Id.* ¶ 2. In response, the Fopmas hired the insureds to remedy the problem. *Id.* ¶ 3. After several unsuccessful attempts, the insureds' employee, Jeffery Holiday, sprayed the Fopma's crawl space with an insecticide known as Drione. *Id.* ¶ 4. At the time Holiday sprayed the Drione, he was aware that Mrs. Fopma was at home, yet he did not ask her to leave, nor did he advise her to take any precautions. *Id.* ¶ 5. While Holiday sprayed, Mrs. Fopma stayed inside her home and took a nap. *Id.* ¶ 6. She was awakened a short time later coughing, wheezing and choking; the interior of her home had become filled with a white, cloudy dust. *Id.*

The air handler for the Fopmas' air conditioning unit is located in the crawl space of their home. *Id.* ¶ 7. The Fopmas allege that Holiday negligently failed to turn off the air conditioning system before he sprayed. *Id.* The Drione, therefore, was pulled into the air handler and spread throughout the Fopmas' home. *Id.* As a result, the Mrs. Fopmas suffered personal injuries and the couple suffered substantial property damage. *Id.* ¶¶ 8, 11, 14–16, 19–23.

The gravamen of the insurer's assertion of non-coverage is found in Paragraph 10 of the Fopmas' complaint. That paragraph alleges that as a result of his actions at the Fopma residence, Holiday's conduct "has been determined by the Maryland Department of Agriculture to violate COMAR[, the Code of Maryland Regulations, § ]15.05.01.02B(3)(a), which requires that a pesticide applicator observe precautions in the handling, use, storage and disposal of pesticides so that pesticides do not move from the intended site of application."[4] *Id.* ¶ 10. In addition, paragraph 13 of the complaint alleged:

In knowingly failing [sic] to turn off the air handler of the [Fopma's] property prior to spraying Drione into the property's crawl space, Mr. Holiday acted with gross negligence and with a wanton, reckless and outrageous disregard for human health, safety and life, [and] egregiously violated the applicable standards of the pest control industry as reflected, in part, in COMAR 15.05.01.02B(3)(a).

According to the terms of the policy, the insurer generally has a duty to defend and indemnify the insureds as to "bodily injury" and "property damage" claims caused by the negligence of the insureds. Pls' Mem. of Law in Supp. of their Mot. for Summ. J. Ex. A at § I.A.1(a). Under the terms of the main policy, the insurer's general obligations to defend and indemnify do not apply to:

"Bodily injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

\*   \*   \*   \*   \*   \*

At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or

---

**3.** The complaint referred to is the Fopmas' three count amended complaint. While the matter is not entirely free of doubt, it appears that Count I of the amended complaint was intended to allege negligence as measured by the relevant state regulations discussed *infra* and that Count II was intended to allege common law negligence, however, both counts describe the negligence as "gross" and "wanton." Moreover, Count II does not contain a prayer for damages. Count III sought damages for loss of consortium.

**4.** Section 15.05.01.02B(3)(a) of the Code of Maryland Regulations (1980, 1994 Supp.) ("COMAR") provides as follows:

15.05.01.02 General Requirements for Applying or Recommending Pesticides.

\*   \*   \*   \*   \*   \*

B. Pesticide Use or Recommendation. When using or recommending pesticides, a person shall:

\*   \*   \*   \*   \*   \*

(3) Observe all precautions in the handling, use, storage, and disposal of pesticides and their containers so that:
(a) Pesticides do not move from the intended site of application. . . .

indirectly on any insured's behalf are performing operations:

> (i) if the pollutants are brought on or to the premises, site or location in connection with such operations by such insured, contractor or subcontractor....

*Id.* § I.A.2.f.(1)(d)(i) ("pollution exclusion clause"). However, the insureds purchased a "Pesticide or Herbicide Applicator Coverage" endorsement ("the endorsement") which modifies the above-quoted exclusion. The endorsement provides, in relevant part, as follows:

> With respect to [Exterminating and Fumigating Operations], paragraph (1.)(d.)(i.) of exclusion f. of Coverage A (Section 1) [the pollution exclusion clause] does not apply if the operations meet all standards of any statute, ordinance, regulation or license requirements of any federal, state or local government which apply to those operations.

*Id.* Ex. B.[5] A "Memo of Clarification" attached to the policy explains that "[w]ere it not for this endorsement, one of the primary exposures of an applicator's business would be excluded because of the absolute pollution or contamination exclusion of the ... policy." *Id.* Ex. C.

Upon demand for coverage by the insureds, the insurer denied coverage as to the Fopmas claims. *See id.* Ex. F. The insurer explained that the endorsement did not cover the Fopmas' claims because of the Maryland Department of Agriculture's determination that Holiday had violated COMAR § 15.05.01.02B(3)(a). *Id.* Ex. E. The insurer explained this "violation of law" exception as follows: "Absent information which suggests that the insureds' operations at the [Fopma's] home met all standards of any statute, ordinance, regulation or license requirement of any state government which apply to those operations, [we] must continue to deny coverage for this claim." *Id.* Thus, in the view of the insurer, any primary negligence in the actual administration of a pesti-

cide treatment which also violates a state regulation forecloses coverage and obviates its duty to defend or indemnify.

### (iii)

The Maryland Court of Appeals has delineated a two-part inquiry for determination of insurance coverage questions. *See St. Paul Fire & Marine Ins. Co. v. Pryseski,* 292 Md. 187, 193, 438 A.2d 282, 285 (1981). Judge Eldridge explained that:

> In determining whether a liability insurer has a duty to provide its insured with a defense in a tort suit, two types of questions ordinarily must be answered: (1) what is the coverage and what are the defenses under the terms and requirements of the insurance policy? (2) do the allegations in the tort action potentially bring the tort claim within the policy's coverage? The first question focuses upon the language and requirements of the policy, and the second question focuses upon the allegations of the tort suit.

*Id.* *See also Sullins v. Allstate Ins. Co.,* 340 Md. 503, 509, 667 A.2d 617, 619–20 (1996); *Chantel Assoc. v. Mount Vernon Fire Ins. Co.,* 338 Md. 131, 141–42, 656 A.2d 779, 784–85 (1995); *Aetna Cas. & Surety Co. v. Cochran,* 337 Md. 98, 102–04, 651 A.2d 859, 861–62 (1995); *Brohawn,* 276 Md. 396, 347 A.2d 842.

██ The starting point for my analysis, therefore, is with the terms of the policy itself. The salient guideposts informing the interpretation of insurance policies in Maryland are well-settled. The fundamental principles were most recently summarized in *Sullins v. Allstate Ins. Co.:*

> In Maryland, insurance policies, like other contracts, are construed as a whole to determine the parties' intentions. *Cheney v. Bell National Life,* 315 Md. 761, 766–67, 556 A.2d 1135 (1989). Words are given their "customary ordinary, and accepted meaning," unless there is an indication that the parties intended to use the words in a technical sense. *Id., see also Chantel As-*

---

5. The insureds also have an umbrella policy with the insurer. The relevant language under the umbrella policy parallels that contained in the general policy and the endorsement. Pls' Mem. of Law in Supp. of their Mot. for Summ. J. Ex. D. Thus, the following analysis applies with equal force to the umbrella policy as well.

sociates v. Mt. Vernon, 338 Md. 131, 142, 656 A.2d 779 (1995). "A word's ordinary signification is tested by what a reasonably prudent layperson would attach to the term." *Bausch & Lomb v. Utica Mutual,* 330 Md. 758, 779, 625 A.2d 1021 (1993). If the language in an insurance policy suggests more than one meaning to a reasonably prudent lay person, it is ambiguous. *Collier v. MD–Individual Practice,* 327 Md. 1, 607 A.2d 537 (1992); *Pacific Indem. v. Interstate Fire & Cas.,* 302 Md. 383, 488 A.2d 486 (1985). A term which is clear in one context may be ambiguous in another. *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 74, 517 A.2d 730 (1986); *Bentz v. Mutual Fire,* 83 Md.App. 524, 537, 575 A.2d 795 (1990).

Where terms are ambiguous, extrinsic and parol evidence may be considered to ascertain the intentions of the parties. *Cheney, supra,* 315 Md. at 766–67, 556 A.2d 1135. "Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer." *Id.* Nevertheless, "if no extrinsic or parol evidence is introduced, it will be construed against the insurer as the drafter of the instrument." *Id.; see also, e.g., Collier, supra,* 327 Md. at 5–6, 607 A.2d 537; *Mut. Fire, Marine & Inland Ins. v. Vollmer,* 306 Md. 243, 251, 508 A.2d 130 (1986); *St. Paul Fire & Marine Ins. v. Pryseski,* 292 Md. 187, 193–96, 438 A.2d 282 (1981); *Truck Ins. Exch. v. Marks Rentals,* 288 Md. 428, 435, 418 A.2d 1187 (1980); *Aragona v. St. Paul Fire & Mar. Ins.,* 281 Md. 371, 375, 378 A.2d 1346 (1977).

340 Md. at 508–09, 667 A.2d at 619. Furthermore, an endorsement should be construed in harmony with the main insurance contract. *Truck Ins. Exch. v. Marks Rentals, Inc.,* 288 Md. 428, 436, 418 A.2d 1187, 1191 (1980).

■ Of equal importance is the longstanding rule in Maryland that insurance policy terms may not contravene an important public policy. Thus, where "a statute, regulation, or public policy is violated," the policy should not be measured by its terms. *Harford County v. Harford Mut. Ins. Co.,* 327 Md. 418, 434, 610 A.2d 286, 294 (1992); *see also Chantel,* 338 Md. at 142, 656 A.2d at 785; *Cochran,* 337 Md. at 104, 651 A.2d at 862; *Pacific Indem. Co. v. Interstate Fire & Cas. Co.,* 302 Md. 383, 388, 488 A.2d 486, 488 (1985). Rather, "a clause in an insurance policy, which is contrary to 'the public policy of this State, as set forth in ... the Insurance Code' or other statute, is invalid and unenforceable." *Jennings v. GEICO,* 302 Md. 352, 356, 488 A.2d 166, 168 (1985). *See also Finci v. American Cas. Co.,* 323 Md. 358, 378, 593 A.2d 1069, 1079 (1991). The Maryland Court of Appeals has cautioned, however, that courts should be hesitant,

"to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is where 'the common sense of the entire community would ... pronounce it' invalid. This reluctance on the part of the judiciary to nullify contractual arrangements on public policy grounds also serves to protect the public interest in having individuals exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle."

*Id.* at 378–79, 593 A.2d at 1079 (quoting *Maryland Nat'l Cap. Park & Planning Comm'n v. Washington Nat'l Arena,* 282 Md. 588, 606, 386 A.2d 1216, 1228–29 (1978)) (citation omitted in the original).

In the instant case, each of these guideposts points to the same conclusion; there is a duty to defend, and almost certainly, as well, a duty to indemnify. Under the insurer's interpretation of the policy and the endorsement, a cruel gag will be perpetrated upon insureds; insureds will not have coverage for precisely the kinds of operational errors amounting to primary negligence for which insurance protection is needed, and for which the Maryland regulatory regime requires coverage. Thus, I conclude for the reasons stated below that the inherently ambiguous language of the policy should be interpreted to (1) avoid an interpretive absurdity and (2) avoid a conflict with a manifest public policy.

(iv)

■ The policy at issue here contains a general pollution exclusion clause. Pollutants which are excluded by the policy include "any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste." Pls' Mem. of Law in Supp. of their Mot. for Summ. J. Ex. A at § I.A.2.f.(2). Excluded injuries must have "aris[en] out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." *Id.* § I.A.2.f.(1). It is patently clear on the face of this language that there is no coverage for bodily injury or property damage caused by pesticides under the main policy.

Nonetheless, the "Pesticide or Herbicide Applicator Coverage" endorsement purports to restore coverage for injury claims as to which the pollution exclusion clause denies coverage. As set forth *supra,* the clause states that:

> With respect to [Exterminating and Fumigating Operations], paragraph (1.)(d.)(i.) of exclusion f. of Coverage A (Section 1) [the pollution exclusion clause] does not apply *if the operations meet all standards of any statute, ordinance, regulation or license requirements of any federal, state or local government which apply to those operations.*

Pls' Mem. of Law in Supp. of their Mot. for Summ. J. Ex. B. (emphasis supplied) According to the insurer's literal interpretation of this clause, this endorsement provides benefits only if, at all times, the insureds are in compliance with all statutes, ordinances, regulations and licensing requirements covering the commercial pesticide industry. However, the insureds and the Fopmas argue that if I adopt the interpretation of the endorsement urged by the insurer, I would render the endorsement a nullity because there would be no instance in which the insureds would ever be able to utilize the "coverage" ostensibly supplied by the endorsement. I agree with the insureds.

(a)

First, the phrase "if the operations meet all standards of any statute, ordinance, regulation or license requirements" is unavoidably ambiguous. It can reasonably (even if not grammatically) be read as providing that coverage is conditioned upon satisfaction by the insureds of all "structural" requirements of the insured's business operations, i.e., compliance with all statutes, ordinances and regulations relating to licensing and certification under Maryland law, such as inspection, training and insurance requirements, but not the "operational" aspects of servicing customers. This interpretation (if any) makes sense because the inclusion of the term "license requirements" at the end of the phrase arguably is intended to modify the subphrase "all standards of any statute, ordinance, regulation." Since any "license requirement" could only appear in and arise from a "statute, ordinance [or] regulation," the specific inclusion of the term "license requirement" at the end of the phrase is mere surplusage unless its inclusion there is a sign that it was intended to serve some office within the phrase as a whole.

Alternatively, the phrase could be read, as the insurer reads it, to require that in addition to the "structural requirements" of the insureds' business, that each operational detail in the individual use of pesticides must also conform with "all standards of any statute, ordinance, regulation or license requirements," such as pesticide handling and application requirements. However, as the insured points out, "[i]t is hard to imagine that an exterminating company could commit any act of [common law] negligence involving pesticides that would not violate" a regulation. Pls' Mem. of Law in Supp. of their Mot. for Summ. J. at 11. *See also* Fopmas' Mot. for Summ. J. Indeed, the very regulation at issue here seems to impose merely a "due care" standard of performance, which would exist as a matter of law even if the regulation did not prescribe such a standard. Moreover, the policy already excludes coverage for *intentional* acts. *Id.* at Ex. A at § I.A.2.a. Therefore, if the policy excludes both intentional acts and acts of negligence, there would be no instance when the endorsement would provide coverage. The Court of Appeals of Georgia aptly explained the basis for judi-

cial rejection of this "heads we win, tails you lose" approach in an analogous case:

> [O]ne generally is not "legally required to pay for bodily injury or property damage" unless there is a violation of some principle of law applicable to the occurrence.... If the [pesticide] coverage endorsement is vitiated in such circumstances by virtue of the exclusion ..., then the protection afforded by the specific endorsement is merely illusory. To permit such construction of the exclusion as appellant urges "would be to hoodwink most insurance purchasers, for it would make a nullity of most coverage. Purchasers believe, and with good reason, that they have bought insurance to protect themselves from precisely those degrees of negligence or outright carelessness that [laws and regulations] might condemn. Insurance is procured to protect the violator, and every violation cannot nullify coverage." *Ranger Ins. Co. v. Culberson,* 454 F.2d 857, 864–865 (5th Cir.1971) [, *cert. denied,* 407 U.S. 916, 92 S.Ct. 2440, 32 L.Ed.2d 691 (1972) ].

*United States Fire Ins. Co. v. Hilde,* 172 Ga.App. 161, 322 S.E.2d 285, 288 (1984).

■ Any ambiguity in an insurance policy is construed against the insurer as the drafting party, *see Sullins,* 340 Md. at 508–09, 667 A.2d at 619 (collecting cases), and absurd results should be avoided, *Howell v. Harleysville Mut. Ins. Co.,* 305 Md. 435, 443, 505 A.2d 109, 113 (1986). Thus, the endorsement cannot reasonably be construed to exclude coverage whenever a law or regulation is violated in the application of pesticides.[6]

■ Furthermore, § 5–206 of the Agriculture Article of the Maryland Annotated Code provides that the "Secretary [of Agriculture] may establish minimum requirements for financial responsibility for all damages which may be incurred in the commercial application of pesticides." The regulations promulgated by the Maryland Department of Agriculture set the minimum requirements as follows:

> C. Insurance Requirements. An applicant for a pesticide business license or a renewal of a pesticide business license shall:
>
> (1) Meet the requirements for minimum financial responsibility for bodily injury and property damage by carrying liability insurance with limits not less than:
>
> (a) Bodily injury—$100,000 each person, $300,000 each occurrence;
>
> (b) Property damage—$15,000 each occurrence, $30,000 annual aggregate provision.
>
> (2) Furnish to the Department a certificate of insurance by an insurance company licensed to do business in the State. The licensee shall keep the insurance in force for the licensing period.

COMAR § 15.05.01.10. *See also* Md.Code Ann., Agric. § 5–207(g). Failure "to establish and consistently maintain liability insurance required by this" regulation may result in civil penalties, or suspension, revocation or denial of a license. COMAR § 15.05.01.18. These statutes and regulations further buttress my view that the endorsement's exclusion must be read as construed *supra.* Otherwise, the exclusion would diminish coverage below these minimums (by excluding it in every case of ordi-

---

6. In addition, the result suggested by the insurer clearly runs contrary to the intentions of the parties, as the obvious purpose of the endorsement was to provide insurance coverage for negligent applications. *See Hilde,* 322 S.E.2d at 288. Rather, the exclusion should be interpreted (if it means anything at all) as requiring a pesticide applicator to meet all structural legal requirements for a pesticide applicator business in order to invoke the coverage provided by the endorsement. *See, e.g.,* Md.Code Ann., Agric. § 5–206 (1957, 1985 Repl.Vol., 1995 Supp.) (minimum financial requirements); *id.* § 5–207 ("certificate indicating competence," "passing a written examination" to demonstrate competence, maintain a license); *id.* § 5–209.1 (regis-

tration and training of employees); *see also* COMAR § 15.05.02.03A (licensing and certification requirements); *id.* § 15.05.02.03F (business name and license number must appear on all motor vehicles transporting pesticides).

What the Maryland Court of Appeals said more than 50 years ago about statutes has application in this case of contract interpretation:

> It is not judicial legislation for courts to construe acts according to their obvious intent and meaning, considering the purpose of their enactment. That is one of the cardinal rules of construction of statutes. *Real intent must prevail over literal intent.*

*State v. Petrushansky,* 183 Md. 67, 71, 36 A.2d 533, 535 (1944) (emphasis supplied).

nary negligence) and would potentially place insureds in violation of Maryland law. In sum, the exclusion would be void. *See Finci*, 323 Md. at 378, 593 A.2d at 1079; *Jennings*, 302 Md. at 356, 488 A.2d at 168. Accordingly, either on the basis of an interpretation that leaves the exception to coverage potentially available in some cases, or on the basis of a finding that the only legitimate reading of the exception to coverage violates the public policy of the state and is therefore void, I reject the insurer's proffered interpretation of the endorsement.

(b)

■ The second half of the duty to defend inquiry directs the court's attention to the allegations in "the complaint and appropriate extrinsic evidence" to determine if they "disclose[ ] a potentiality of coverage under [the] insurance policy." *Chantel*, 338 Md. at 142, 656 A.2d at 784. The denial of coverage here was based on the allegations in paragraphs 10, 13 and 17, which allege a violation of a Maryland regulation. The regulation involved, however, COMAR § 15.05.01.02B(3)(a), deals with the use of pesticides, not with the structural requirements for setting up a pesticide application business. Specifically, the regulation provides that "[w]hen using or recommending pesticides" the applicator shall use due care "so that ... [p]esticides do not move from the intended site of application...." *Id.* No other violation of any law or regulation, local, state or federal is alleged, and no other policy exclusion or argument for denying coverage is advanced by the insurer. In accordance with the preceding discussion, I conclude that the insurer had a duty to defend the insureds in the *Fopma* action from its inception.[7]

A separate order shall be entered.

## ORDER

For the reasons set forth in the foregoing Memorandum Opinion, it is this 10th day of April 1996, by the United States District Court for the District of Maryland,

(1) ORDERED that the Fopmas' Motion to Intervene BE, and it hereby IS, GRANTED; and it is further

(2) ORDERED that the Fopmas' Motion for Summary Judgment BE, and it hereby IS, GRANTED; and it is further

(3) ORDERED that the Plaintiffs' Motion for Summary Judgment BE, and it hereby IS, GRANTED; and it is further

(4) ORDERED that Defendant's Motion for Summary Judgment BE, and it hereby IS, DENIED; and it is further

(5) ORDERED, ADJUDGED, DECREED AND DECLARED that Zurich–American Insurance Group owes a duty to defend the defendants named in the case of *Fopma v. Home Exterminating Company, Inc., et al.*, no. 95CV0360, pending in the Circuit Court for Worcester County, Maryland, pursuant to policy number GLO 1457482–03; and it is further

(6) ORDERED that the Clerk of the Court CLOSE this case.

---

7. Although it is difficult to imagine from the allegations that any evidence is available to take Holiday's negligent act outside of the policy, a determination of the question of indemnification would be premature at this time; such a determination can only be made after the *Fopma* action is resolved. *Brohawn*, 276 Md. at 404–06, 347 A.2d at 848–49. The issue of duty to indemnify, therefore, shall not be decided at this time, as it is not ripe for decision.